# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANITA MILLER, THOMAS SIMMONS, JENNIFER SCHUBERT, and ADAM HICKS, on behalf of themselves and all others similarly situated, | Case No.: 1:23-cv-3797 |
| Plaintiffs, | **FIRST AMENDED<br>CLASS ACTION COMPLAINT**<br>(**Jury Trial Demanded**) |
| v. | |
| INSINKERATOR, LLC, | |
| Defendant. | |

Anita Miller, Thomas Simmons, Jennifer Schubert, and Adam Hicks ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, bring this First Amended Class Action Complaint against Defendant InSinkErator, LLC ("Defendant" or "InSinkErator") and in support allege, upon information and belief and based on the investigation of counsel, as follows:

## NATURE OF THE CASE

1.      Established in 1938, InSinkErator claims to be "the world's largest manufacturer of garbage disposals and instant hot water dispensers for home and commercial use."[1]

2.      More specifically, InSinkErator touts that "the name InSinkErator® has been synonymous with garbage disposals for over 80 years. *They were our idea*." [Emphasis Added].[2]

3.      Offering "a garbage disposal for every household and budget," InSinkErator has three series of household garbage disposals: 1) Standard Series, 2) Power Series, and 3) Quiet

---

[1] https://insinkerator.emerson.com/en-us/about-us (Last Accessed March 14, 2023).
[2] *Id.*

Series. InSinkErator also manufactures garbage disposals that are sold under the following brands: Ace, Home Depot/Wilmar/Interline, Evergrind, Westcraft, and Whirlpool.

4.      Within the Standard and Power Series are several "Badger" models designed and manufactured in a substantially similar manner, with the same non-stainless-steel components at issue in this litigation, and sold under the following model names: Badger 1, Badger 1XL, Badger 100, Badger 5, Badger 5XL, Badger 5XP, Badger 500, and Badger 5XP [100 and 900]. Ace models 2000 and 3000, Home Depot/Wilmar/Interline Premier models, Evergrind models E101, E102 and FWD-1, Westcraft models 7507312, 7507336, 7507302 and 7507306, and Whirlpool models GC1000PE, WG1202PH, GC5000XE, WG1202XH and GC1000XE are rebranded Badger disposals with the same non-stainless-steel components at issue in this litigation.   (Collectively "Badgers" or "Class Badgers".)

5.      A representative photograph of the Badger 1:



6.      InSinkErator has been selling the Badgers since the 1990s and represents the Badgers to consumers as setting the "standard for performance and reliability," and delivering

"advanced performance" for home garbage disposals,[3] and ranging in retail price from approximately $100–$200.

7.      Importantly, InSinkErator represents to consumers that the Badgers are quality, long-lasting garbage disposals that are made with "Rugged Galvanized Steel Construction (*For Disposer Durability*)."[4]

8.      However, despite this explicit representation that the Badgers' materials were selected for "Disposer Durability," InSinkErator selected materials, designed, manufactured, distributed, marketed, and sold the Badgers with improper materials, including zinc coated, galvanized steel (the "Defect").

9.      As more fully described below, Defect allows the water from the sink faucet to permeate the zinc coating and corrode the steel and causes the plastic casing/housing and/or bottom of the Badger to prematurely fail and leak into cabinetry and onto flooring.

10.     The Defect is latent, as well as the initial corrosion that begins to occur inside the Badgers, resulting in total failure and leakage well before the expected average service life of a garbage disposal.

11.     Based on industry standards, the average service life of a garbage disposal is 12–15 years, with the International Association of Certified Home Inspectors being on the conservative average service life of 12 years.[5]

---

[3] https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals (Last Accessed March 14, 2023).
[4] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf [Emphasis Added](Last Accessed March 14, 2023).
[5] https://www.nachi.org/life-expectancy.htm; https://plumblineservices.com/help-guides/when-should-i-replace-my-garbaInSinkErator-disposal (citing the International Association of Certified Home Inspectors); https://www.bobvila.com/articles/how-long-do-garbaInSinkErator-disposals-last/ (Last Accessed March 14, 2023).

12.     Despite widely accepted industry standards, InSinkErator boldly represented to Plaintiffs and Class Members that the "industry wide average life of a garbage disposal is 6 to 8 years"[6]—half what is actually expected but longer than most of its Badger warranty durations.

13.     Notably, upon information and belief, Whirlpool removed its website representations that the average service life of a garbage disposal of 6–8 years, after and because of Plaintiffs' notice to Whirlpool of Plaintiffs' claims, which included this representation. Instead, Whirlpool now refers consumers to the exact durational term of each warranty.[7] However, despite its attempted remedial efforts, Whirlpool's corrective representation is not applicable to Plaintiffs or other consumers who purchased prior to the website and other material changes in product representations after notice was provided.

14.     Despite this average service life, Insinkerator only provides a 1–4 Year "In-House Full Service Limited Warranty" (the "Warranty") depending upon the Badger model.

15.     However, the Badgers commonly and consistently fail prematurely, causing leaking not only prior to the industry accepted service life of 12–15 years, prior to InSinkErator's represented average of 6–8 years,[8] but after InSinkErator's Warranty has expired.

16.     Leaking occurs at the areas in the plastic housing the encases the garbage disposal (left) and bottom of the garbage disposal (right) with red arrow diagrams:

---

[6] https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals (Last Accessed March 14, 2023).
[7] https://insinkerator.emerson.com/en-us/insinkerator-products/garbage-disposals/power-series (Last Accessed June 13, 2023).
[8] *Id.*



17.     When consumers make warranty claims related to leaking, the claims are improperly denied, or InSinkErator replaces the defective Badger with another defective Badger that has failed or is likely to fail again because of the Defect.

18.     For example, one Amazon user noted multiple Badgers having failed in the same manner, leaking through the plastic housing[9]:



---

[9] https://www.amazon.com/productreviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&paInSinkEratorNumber=1#reviews-filter-bar (Last Accessed March 14, 2023).

19.     Additionally, and by way of example, Plaintiff Schubert's Badger failed in the same manner:



20.     Accordingly, the Badgers are not suitable for their intended use as household garbage disposals that safely dispose of food waste under the sink and into the home plumbing system.

21.     InSinkErator had alternative designs, materials selection, and manufacture, including utilizing stainless steel as it does in its other models, including the residential model the Badger 1HP.[10]

22.     InSinkErator had knowledge of the Defect well before many Class Members purchased the Badgers. In fact, as demonstrated below, InSinkErator has known for at least 10 years that the Badgers were defectively designed and/or manufactured with inadequate materials in each of the Class Badgers.

23.     The Defect in the Badgers exists at the time the Badgers leave the manufacturer, and before they are purchased by consumers; however, such Defect is latent because no reasonable

---

[10] *See* https://insinkerator.emerson.com/documents/badger-1hp-specification-sheet-en-us-6867972.pdf (Last Accessed March 21, 2023).

consumer would know that galvanized steel is not suitable for use in a garbage disposal, and thus, Plaintiffs and Class Members could not have known about the Defect at the time of purchase through any due diligence.

24.     As the Defect leads to corrosion of the garbage disposals' components, there is no repair or patching that can be accomplished to fix the Defect or damage.

25.     Despite InSinkErator's longstanding knowledge of this Defect, InSinkErator has failed to remedy the Defect (i.e. replace the mild galvanized steel with more appropriate and durable stainless steel) and also failed to inform consumers of the Defect.

26.     Instead, in contravention of the InSinkErator's Warranty, which fails of its essential purpose and is unconscionable, InSinkErator has repeatedly denied there is any Defect and has placed the burden of replacing the defective Badgers and paying for the costs of repairs to the adjacent personal property damaged as a result of leakage caused by the Defect.

27.     Prior to purchasing the Class Badgers, Plaintiffs and other Class Members did not know that the Class Badgers would be designed and manufactured with inferior materials for use as a garbage disposal, and would fail and leak, requiring the consumer to prematurely assume the burden of costly repairs.

28.     Defendant knew or should have known that the Class Badgers were defectively designed and manufactured with inferior materials that lead to failure of the Badgers' components and are not fit for their intended purpose of providing customers with a reliable method of disposing of food.

29.     Nevertheless, Defendant failed to disclose this Defect to Plaintiffs and Class Members at the time of purchase or thereafter and continued to manufacture the Badgers in the same defective manner.

7

30. The existence of the Defect is a material fact that reasonable consumers, including Plaintiffs and Class Members, would have considered when deciding whether to purchase the Badgers.

31. Had Plaintiffs and Class Members known about the Defect at the time of purchase, as well as the associated costs related to repair or replace the Badgers, Plaintiffs and the Class Members would not have purchased the Badgers or would have paid less for them.

32. Plaintiffs and Class Members also would not have agreed to the Warranty terms or limitations associated with the Warranty.

## PARTIES

33. Plaintiff Anita Miller is a resident and citizen of Lansing, Illinois.

34. Plaintiff Thomas Simmons is a resident and citizen of Van Nuys, California.

35. Plaintiff Jennifer Schubert is a resident and citizen of North Attleboro, Massachusetts.

36. Plaintiff Adam Hicks is a resident and citizen of Lees Summit, Missouri.

37. Defendant InSinkErator, LLC is incorporated in Delaware, with its principal place of business in Wisconsin.

38. At all times relevant herein, Defendant transacted and conducted business throughout the United States, including the states of Illinois.

39. InSinkErator designs, develops, manufactures, distributes, markets, and directs the marketing of its Badgers throughout the United States, including the state of Illinois.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because: (1) there are one hundred or more (named and unnamed) class members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity because Plaintiffs and Defendant are citizens of different States.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

41.     This Court may exercise personal jurisdiction over Defendant because Defendant does substantial business in this State and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of products in this District, and has engaged in the unlawful practices described in this Complaint within this District.

42.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

43.     In 1927, Wisconsin architect John Hammes invented a food waste disposer, hoping to "eliminate having to take out the garbage by instead grinding food scraps into fine particles and sending them to the local wastewater treatment plant."[11]  Mr. Hammes was issued a U.S. Patent for the garbage disposal just 8 years later, in 1935.[12]

44.     The originally patented device is similar to current iterations in that each connects to an electric motor and grinds food waste into small pieces that can be discharged through household plumbing into the sewage system.[13]

---

[11] https://insinkerator.emerson.com/en-us/about-us/garbaInSinkErator-disposal-timeline (Last Accessed March 14, 2023).
[12] *Id.*
[13] *Id.*

45.     Just three years following the original patent, Mr. Hamm established "In-Sink-Erator Manufacturing Company" in Wisconsin, where garbage disposals begin production and distribution to homes.[14]

46.     Garbage disposals have historically been required in areas such as Adams, Massachusetts.[15]  By 2007, approximately 50% of homes in the U.S. had a garbage disposal.[16]  By 2013, approximately 52% of U.S. households had garbage disposals.[17]   Use of garbage disposal has also likely increased due to the health, disease prevention, and environmental benefits created by disposal of food through plumbing systems instead of curbside, landfills, or other waste disposal.[18]

47.     As indicated above, since the original InSinkErator company was established, it has become "the world's largest manufacturer of garbage disposals…for home and commercial use."[19] It has increased its domestic presence to "nearly 80 countries."[20]

48.     In 1986, the original InSinkErator company was acquired by Emerson Electric Company.

49.     However, upon information and belief, this acquisition by Emerson is what led the original Instead, Emerson and Insinkerator, companies committed to providing quality, American-

---

[14] *Id.*
[15] Stafford, Scott. "Adams Drops Requirement for Garbage Disposals in New Housing, Hoping to Reduce the Cost of Construction and the Cost to the Environment." The Berkshire Eagle, 26 June 2022, https://www.berkshireeagle.com/news/northern_berkshires/no-need-for-a-garbage-disposal-in-adams/article_3447ae5a-f3f8-11ec-b0d5-f36f05bc387a.html.
[16] *Id.*
[17] U.S. Census Bureau 2013 American Housing Survey, https://www.census.gov/programs-surveys/ (Last Accessed May 5, 2023).
[18] *Id.*
[19] https://insinkerator.emerson.com/en-us/about-us (Last Accessed March 14, 2023).
[20] *Id.*

made garbage disposals[21]—to redesign its products with inferior materials in order to increase sales.

50.     For the next 54 years, Emerson and Insinkerator continued to select materials, design, manufacture, and distribute the Badgers and other InSinkErator products.

51.     For the fiscal period of March 2021–March 2022, InSinkErator's twelve-month revenue was $595 million.[22]

52.     On August 8, 2022, Emerson announced it was selling InSinkErator to Whirlpool Corporation[23] for $3 billion, as "a meaningful step in Emerson's continued commitment to creating a higher growth, more diversified and cohesive portfolio."[24]

53.     Despite the recent sale, InSinkErator continues to boast that its products are "Assembled in America," and that the "InSinkErator Quality Policy" is "*The customer comes first and what I do must be right*."[25]

## MATERIALS, DESIGN, MANUFACTURE, AND DEFECT

54.     The Badgers are used, and intended by InSinkErator to be used, for reliable and convenient food waste disposal under kitchen sinks.

55.     Each Badger is designed and manufactured to grind food waste into small particles that can easily pass through household plumbing and be disposed into the sewage system. This process is accomplished utilizing various mechanical parts, including an electric motor, food grinding parts, plastic housing, and plumbing fitting.

---

[21] *See* https://www.emerson.com/en-us/news/corporate/insinkerator-agreement (Last Accessed March 14, 2023)(Emerson is a "global technology and software company providing innovative solutions for customers in industrial, commercial, and residential markets.").
[22] https://www.emerson.com/en-us/news/corporate/insinkerator-agreement (Last Access March 14, 2023).
[23] Plaintiffs have confirmed through counsel for Insinkerator information necessary to dismiss Whirlpool Corporation and Emerson Electric Company from this litigation and establish that Insinkerator, LLC is the proper party.
[24] https://www.emerson.com/en-us/news/corporate/insinkerator-agreement (Last Access March 14, 2023).
[25] https://insinkerator.emerson.com/en-us/about-us (Last Accessed March 14, 2023).

56.     A connection parts diagram and cross-section of the Badger are below:



57.     The "Grinder Plate" is the motorized plate that spins and presses the food against a grind ring.

58.     The "Grind Ring" is a mild steel perimeter ring with cutouts that grinds food into small particles that are then dispatched into the "Grind Chamber" below it, for dispersal into plumbing through the plumbing attachment.

59.     Collectively these parts make up the "Grind Assembly," which is responsible for the majority of the Badgers' work in properly disposing of food waste.

60.     The Grind Assembly, is contained within a "Plastic Housing" that is meant to contain the water and wet food waste from sink cabinetry while the food is dispersed into the plumbing.

61.     InSinkErator represents in its materials specifications, its website, and in other marketing materials that the Badgers are constructed with "Rugged Galvanized Steel Construction (*For Disposer Durability*)."[26]

62.     The Grind Assembly components are designed and manufactured with a zinc-covered, mild galvanized steel that is intended to collect water and grind and dispose of food through the drain outlet.

63.     Plastic housing that encases the Badgers mostly conceals the Grind Assembly's steel components.

64.     Zinc is a sacrificial coating that when applied to steel is consumed by corrosion over time. The zinc coating on the Grind Assembly is abraded away by food being ground against the coating through the normal, foreseeable use.

65.     The garbage disposal has a port that is intended to be connected to a dishwasher drain hose.  The detergents used in dishwashers oxidize and consume the sacrificial zinc coating.

66.     The abrasion and consumption of the zinc coating leaves the underlying steel with no form of corrosion protection. As a result, the steel also corrodes through normal, foreseeable use.

67.     When the steel corrodes, it also expands and leads to splitting of the plastic Housing, as well as corrosion through the Grind Chamber floor. The result is water leaking through the plastic Housing and/or Grind Chamber floor.

68.     The defective material selection, design, and manufacture of zinc coupled with the non-stainless steel causes foreseeable corrosion, failure, and leakage.

---

[26] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf;https://insinkerator.emerson.com/documents/badger-5-specification-sheet-en-us-6868076.pdf [Emphasis Added](Last Accessed March 14, 2023).

69. InSinkErator was aware of alternative, feasible designs of its Products that were available, including the use of stainless-steel components in its Grind Assembly.

70. Specifically, InSinkErator is aware of the more appropriate use of stainless-steel in these assemblies, because it uses "highest durability alloy stainless steel components with LeakGuard Liner™" in its top-end residential models and commercial models.[27]

71. Likewise, competitors of InSinkErator utilized more appropriate designs and material selections to prevent this type of corrosion and leaking, including stainless steel. These garbage disposals are priced comparatively to or below similar Badger models, indicating that it is economically viable to use stainless steel.

72. The difference in cost between the least expensive Badger and the least expensive garbage disposal product offered by InSinkErator with the "highest durability alloy stainless steel components with LeakGuard Liner™" is approximately $100.[28]

73. The Defect renders the Badgers unfit for the ordinary purpose for which they are used, which is to safely and properly dispose of food waste.

74. As a result of the Defect, the Badgers pose an unreasonable risk of harm to consumers and their property, as they are subject to premature failure, leakage, and water damage to cabinetry and flooring.

---

[27] https://insinkerator.emerson.com/en-us/insinkerator-products/garbage-disposals/power-series (Last Accessed June 13, 2023).
[28] *See, e.g.,* https://www.homedepot.com/b/InSinkErator/N-5yc1vZ1or?NCNI-5&searchRedirect=insinkerator&semanticToken=326r10r00f2200000000_20230609162813532156153339526_us-east4-86bn%20326r10r00f2200000000%20%3E%20st%3A%7Binsinkerator%7D%3Ast%20ml%3A%7B24%7D%3Aml%20nr%3A%7Binsinkerator%7D%3Anr%20nf%3A%7Bn%2Fa%7D%3Anf%20qu%3A%7Bin sinkerator%7D%3Aqu%20ie%3A%7B0%7D%3Aie%20qr%3A%7Binsinkerator%7D%3Aqr%20lca%3A%7B553460%7D%3Alca (Last Accessed June 9, 2023).

75.     Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, posed an unreasonable risk of harm to themselves and their property, and would cause damage, they would not have purchased the Badgers at all, or on the same terms or for the same price.

76.     This corrosive failure of the steel and subsequent failures of the Plastic Housing and Grind Chamber floor, results in leakage through the Badgers unit itself, onto its internal electrical wiring and into cabinetry and floors. The leakage often begins so slowly that Plaintiffs and Class Members do not know of the corrosion and gradually accumulating water damage until a complete failure has occurred.

77.     The Defect is latent such that no reasonable customer would know, or be able to discover through inspection, that the inadequate materials were inadequate or that they exist behind plastic housing at the time the Badgers are purchased.

78.     However, InSinkErator knew or should have known of the Defect before it distributed the Badgers into the consumer marketplace.

79.     Plaintiffs and the Class Members have a reasonable expectation that their Badgers will have at least 12 years of useful service life, or at least 6–8 years based on the representations of InSinkErator.[29]

80.     However, due to the latent Defect, the Badgers fail before 12 years and many times within the first 4 years of the service life.

81.     When customers first began to complain to InSinkErator about the Badgers failures, InSinkErator routinely denied the claim or replaced the defective Badger with another defective Badger that is likely to fail prematurely.

---

[29] *See* paras. 10–12.

82. The mounting flange of a Badger is sealed to the sink. When a failed Badger is removed from service, the proprietary to InSinkErator mounting flange and rings remain in place. While Badgers are easily removed, their mounting hardware is much more difficult to remove. The difficulty, cost and potential collateral damage associated removing the proprietary Badger mounting hardware makes it more difficult and expensive to switch to a different brand of garbage disposal and encourages consumers to replace their defective Badger with another defective Badger that is likely to fail prematurely.

83. InSinkErator at all times failed to disclose its knowledge of the Defect to customers during the warranty claims process.

## BADGERS' WARRANTIES

84. InSinkErator expressly and impliedly warrants, via user manuals, advertisements, pamphlets, brochures, circulars, samples, and/or models, that the Badgers are fit for the ordinary purpose for which they are sold.

85. InSinkErator expressly warrants that the Badgers "will be free from defects in materials and workmanship"[30] for at least 1–4 years after installation or purchase.

86. Each of InSinkErator's Warranties contains the same or substantially similar language, with the exception of the durational terms of the Warranty depending upon which Badger is at issue.

87. InSinkErator's manifest intent that its warranties apply to Plaintiffs and consumer Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its Warranty, which is directed to customers for residential use.

---

[30] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf.

16

88.     Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiary of the products and warranties.

89.     Specifically, InSinkErator's Warranty provides as follows[31]:

This limited warranty is provided by InSinkErator®, a business unit of Emerson Electric Co., ("InSinkErator" or "Manufacturer" or "we" or "our" or "us") to the original consumer owner of the InSinkErator product with which this limited warranty is provided (the "InSinkErator Product"), and any subsequent owner of the residence in which the Product was originally installed ("Customer" or "you" or "your").

InSinkErator warrants to Customer that your InSinkErator Product will be free from defects in materials and workmanship, subject to the exclusions described below, for a period of [1-4] years (the "Warranty Period"), commencing on the later of: (a) the date your InSinkErator Product is originally installed, (b) the date of purchase, or (c) the date of manufacture as identified by your InSinkErator Product serial number.

90.     The Warranty fails of its essential purpose and is unconscionable, as more fully described below, because 1) the Defect exists at the time it leaves the manufacturing facility; 2) the Defect precludes the ability to repair the Badgers; 3) InSinkErator fails to disclose its knowledge of the Defect when contacted by customers about Badger failures; and 4) because when it replaces the Badgers it does so with another defective Badger.

91.     Additionally, the Warranty also provides for reimbursement of the Badgers, but only if InSinkErator unilaterally determines repair or replacement to be insufficient. Upon information and belief, as part of its regular business practice, InSinkErator fails to provide for such reimbursement.

92.     As described herein, InSinkErator breached this Warranty at the time Plaintiffs and Class Members purchased the Badgers because the Badgers were defective when they came off

---

[31] *Id.*

the assembly line. Thus, at the time the defective Badgers were sold to consumers, InSinkErator was already in violation of the express Warranty.

93.     In addition, the Warranty has several terms that are unconscionable, for the reasons more fully detailed below.

94.     InSinkErator unilaterally imposed the Warranty terms to its own benefit, and Plaintiffs and Class Members did not have any opportunity to negotiate the terms of the Warranty.

95.     The Warranty is further unconscionable given InSinkErator's knowledge of the Defect, the existence of the Defect at the point of sale, InSinkErator's failure to disclose the Defect at the time of sale and during warranty communications, and in the premature failure of the Badgers.

96.     The Defect renders the Badgers unfit for the ordinary purpose for which they are used, which is to safely and reliably dispose of food waste into the plumbing system.

97.     Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective and would cause damage to other property, they would not have purchased the Badgers at all, or would not have paid the price they did.

98.     In sum, InSinkErator has actively concealed the existence and nature of the Defect from Plaintiffs and Class Members, despite its knowledge of the existence and pervasiveness of the Defect, and certainly well before Plaintiffs and Class members purchased the Badgers and during warranty communications. Specifically, InSinkErator:

    a.     Failed to disclose the Defect to consumers, at or after the time of purchase, including when consumers make warranty claims or otherwise complain to InSinkErator or its affiliates about the Defect;

    b.     Actively concealed the Defect from consumers, at or after the time of purchase, including when consumers make warranty claims, or otherwise complain to InSinkErator about the Defect;

c.  Failed to disclose, and actively concealed the defect from consumers, including that the Badgers were not fit for their intended purpose;

d.  Failed to disclose and actively concealed the Defect from consumers when it improperly and unlawfully denied valid warranty claims; and

e.  Failed to disclose and actively concealed the Defect from consumers when it provided them with replacement Badgers that also contain the Defect.

99.  As a direct, proximate, and foreseeable result of the Defect, Plaintiffs and Class Members suffered damages, including but not limited to: (a) the difference in value of the Badgers as purchased and the Badgers received; (b) loss of use of the Badgers; (c) property damage; and (d) consequential damage.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### Facts Specific to Plaintiff Miller

100.  In May 2019, Ms. Miller was moving into a new residential condominium. The residence did not have a functioning garbage disposal, and Ms. Miller made the replacement of the garbage disposal a condition of the purchase of the condominium.

101.  The sellers selected a new Badger 5, and the purchase price of which was included in the cost of the new Badger was part of the price she paid for her condominium.

102.  On or about May 19, 2019, the Badger was installed in Ms. Miller's residence. Ms. Miller used her Badger for normal, household (non-commercial) use, and it has in fact at all times only been used for normal, foreseeable household purposes.

103.  Once Ms. Miller moved into her new condominium, she began to regularly use the Badger. From the time of purchase until the incident described below, Ms. Miller used the Badger as intended, and maintained it in a reasonable and foreseeable manner.

104.  In or around June 2022, Ms. Miller noticed what she initially believed was condensation on her Badger that had dripped onto the floor. However, upon further inspection, she

discovered that her Badger had water escaping from the seam in the housing of the product, which was the source of the moisture. When she checked the pots and pans under her sink, they had collected water within them.

105.    As a result, Ms. Miller ceased using her garbage disposal altogether as she did not want to risk purchasing a new Badger that would similarly leak.

106.    After experiencing the leakage, Ms. Miller performed research online and discovered numerous other consumers reporting the same or similar incidences of leaks in Badgers.

107.    She expected the Badger would last longer than three years and that the Badger would not prematurely fail or be defective.

108.    However, upon information and belief, any replacement assembly still contains the same Defect, and a repair would not remedy the problem.

109.    Because InSinkErator unlawfully concealed the Defect from Ms. Miller prior to as well as after the Badger was installed in her home and being used, she did not suspect (and had no reason to suspect) that there was anything wrong with the Badger until the Defect manifested.

110.    Ms. Miller's Badger has not operated properly for its life expectancy. Had she known of the Defect, she would not have agreed to have the Badger installed in her residence. Therefore, she did not receive the benefit of her bargain.

111.    On May 17, 2023, Plaintiff Miller put InSinkErator on notice of the Defect, her claims, and damages. InSinkErator did not respond in writing, however, it has denied that there is any Defect.

***Facts Specific to Plaintiff Simmons***

20

112.     In March 2014, Mr. Simmons began shopping for a new, reliable garbage disposal that would be long lasting and not require many repairs.

113.     After researching Badgers, reviewing specifications and other literature, Mr. Simmons selected a Badger 500.

114.     In or about March 2014, Mr. Simmons purchased his Badger from Home Depot for approximately $100.00.  Mr. Simmons paid this amount for his Badger because he believed it to be a high-end Badger compared to other brands and models.

115.     Specifically, in selecting his Badger, Mr. Simmons relied on InSinkErator's representations related to InSinkErator branded garbage disposal's quality and reliability regarding the Badgers.

116.     Mr. Simmons purchased his Badger for normal, household (non-commercial) use, and it has in fact at all times only been used for normal household purposes.

117.     The Badger was installed in his home several days later, in or about March 2014. Once the Badger was installed in Mr. Simmon's kitchen, he began to regularly use it.  From the time of purchase until the incident described below, Mr. Simmons used the Badger as intended, and maintained it in a reasonable and foreseeable manner.

118.     In or around December 2021, Mr. Simmons noticed a leak under his sink.  The moisture was so significant that he placed a large bucket to catch the water to protect his cabinets and flooring.  Upon inspection, he discovered that the source of the moisture was a leak in the bottom of his Badger.

119.     As a result, Mr. Simmons purchased a Badger 900 to replace his original Badger. He purchased the replacement for $169.00 on December 6, 2021.

120.     Shortly after installation, in January 2022, he noticed a leak out of the bottom and upon information and belief, his replacement Badger has the same Defect as his original Badger. Mr. Simmons now avoids using his Badger as much as possible and he leaves a bucket under his Badger in case the Badger begins to leak similarly again.

121.     After experiencing the leakage, Mr. Simmons performed research online and discovered numerous other consumers reporting the same or similar incidences of leaks in Badgers.

122.     Mr. Simmons expected the replacement Badger would last more than a few months and that the Badger would not prematurely fail.

123.     Because InSinkErator unlawfully concealed the Defect from Mr. Simmons before his purchase, as well as after the Badger was installed in his home and being used, he did not suspect (and had no reason to suspect) that there was anything wrong with the Badger until the Defect manifested.

124.     Mr. Simmon's Badger has not operated properly for its life expectancy. Had he known of the defect, he would have either not purchased the Badger or would have paid less than he did.  Therefore, he did not receive the benefit of his bargain.

125.     On May 17, 2023, Plaintiff Simmons put InSinkErator on notice of the Defect, his claims, and damages. InSinkErator did not respond in writing, however, it has denied that there is any Defect.

***Facts Specific to Plaintiff Schubert***

126.     In Spring 2017, Ms. Schubert began shopping for a new, reliable garbage disposal that would replace her garbage disposal.

127. She selected a Badger with one-quarter horsepower because she recognized the InSinkErator brand name and believed that InSinkErator's products were of high quality.

128. Specifically, in selecting her Badger, Ms. Schubert relied on InSinkErator's representations related to InSinkErator branded garbage disposal's quality and reliability regarding the Badgers.

129. In or around Spring 2018, that Badger was purchased from Steve Austin Plumbing for $305, including installation. Ms. Schubert paid this amount for her Badger because she believed InSinkErator to be a reputable brand with affordable garbage disposals.

130. Ms. Schubert purchased her Badger for normal, household (non-commercial) use, and it has in fact at all times only been used for normal household purposes.

131. The Badger was installed in her home in or around Spring 2018. Once the Badger was installed in Ms. Schubert's kitchen, she began to regularly use it. From the time of purchase until the incident described below, Ms. Schubert used the Badger as intended, and maintained it in a reasonable and foreseeable manner.

132. In or around Spring 2021, Ms. Schubert noticed that her Badger was leaking. Upon noticing the leaking, she began shopping for a new, reliable Badger that would replace her previous Badger.

133. After researching Badgers, and reviewing specifications and other literature, she selected a Badger 500 from Steve Austin Plumbing for a total of $350, including installation. Ms. Schubert paid this amount because she believed it to be a higher-end Badger compared to other brands and models, and in particular, her previous Badger.

134. Ms. Schubert purchased her Badger for normal, household (non-commercial) use, and it has in fact at all times only been used for normal, foreseeable household purposes.

135.     The Badger was installed in her home shortly thereafter, in or around Spring 2021. Once the Badger was installed in Ms. Schubert's kitchen, and she began to regularly use it.

136.     From the time of purchase until the incident described below, Ms. Schubert used the Badger as intended, and maintained it in a reasonable and foreseeable manner.

137.     In or around March 2023, Ms. Schubert noticed significant discoloration on her Badger when she cleaned under her sink. Upon inspection and testing, she discovered that her Badger would leak upon use.

138.     Her inspection led her to discover that her three-inch deep plastic tray in which she stored items under her sink was overflowing with water and that her under-sink cabinet bottom was soaked. Approximately two and one-half feet of cabinet bottom under her sink has bowed and requires replacement.

139.     Ms. Schubert called Steve Austin Plumbing to look into what she had discovered. As a result of that visit, Ms. Schubert decided to cease using her garbage disposal altogether.  She will need to purchase a new garbage disposal to replace her Badger because the Badger's failure due to the Defect has caused a total product failure.

140.     Additionally, because of the amount of water that leaks from the Badger when she uses her sink, she is unable to use the sink where the Badger is installed and has lost access to half of her double sink.

141.     Ms. Schubert expected the Badger would last longer than 2 years, if not longer if, and that the Badger would not prematurely fail and cause damage to her home.  Her previous garbage disposal, not an InSinkErator product, lasted more than 15 years.

142.     After experiencing the leakage, Ms. Schubert performed research online and discovered numerous other consumers reporting the same or similar incidences of leaks in Badgers.

143.     Because InSinkErator unlawfully concealed the Defect from Ms. Schubert before her purchase, as well as after the Badger was installed in her home and being used, she did not suspect (and had no reason to suspect) that there was anything wrong with the Badger until the Defect manifested.

144.     Ms. Schubert's Badger has not operated properly for its life expectancy. Had she known of the Defect, she would have either not purchased the Badger or would have paid less than she did. Therefore, she did not receive the benefit of her bargain.

145.     On June 30, 2023, Plaintiff Schubert put InSinkErator on notice of the Defect, her claims, and damages. InSinkErator did not respond in writing, however, it has denied that there is any Defect.

***Facts Specific to Plaintiff Hicks***

146.     In or around Fall 2017, Mr. Hicks began shopping for a new, reliable Badger that would replace his Badger that had begun to rust and leak water shortly after moving into his residence.

147.     After researching Badgers, and reviewing specifications and other literature, Mr. Hicks selected a Badger 300, which was a direct replacement for his previous garbage disposal.

148.     Specifically, in selecting his Badger, Mr. Hicks relied on InSinkErator's representations related to InSinkErator branded garbage disposal's quality and reliability regarding the Badgers. Mr. Hicks was also familiar with Badgers and InSinkErator products generally because he had previously owned a Badger.

149.    In or around Fall 2017, Mr. Hicks purchased his Badger from Home Depot for about $100. Mr. Hicks paid this amount for his Badger because he believed it to be a high-end Badger compared to other brands and models.

150.    Mr. Hicks purchased his Badger for normal, household (non-commercial) use, and it has in fact at all times only been used for normal household purposes.

151.    The Badger was installed in his home shortly thereafter, in or around Fall 2017. Once the Badger was installed in Mr. Hicks's kitchen, and he began to regularly use it.

152.    From the time of purchase until the incident described below, Mr. Hicks used the Badger as intended, and maintained it in a reasonable and foreseeable manner.

153.    In or around June 2020, Mr. Hicks looked under his sink and noticed that water was pooling on the bottom of his cabinet underneath the Badger. Mr. Hicks ultimately needed to replace the cabinetry because the cabinet bottom had swollen and caved in on itself, and he spent approximately $852 doing so as part of a total kitchen remodel.

154.    As a result, Mr. Hicks purchased a replacement Badger 500 for $109 from Home Depot after researching Badgers and reviewing specifications and other literature.  Mr. Hicks expected that upgrading the model would increase the quality and durability of his Badger.

155.    Upon information and belief, this replacement Badger is also defective and will fail in the imminent future.

156.    Because InSinkErator unlawfully concealed the Defect from Mr. Hicks before his purchase, as well as after the Badger was installed in his home and being used, he did not suspect (and had no reason to suspect) that there was anything wrong with the Badger until the Defect manifested.

157.     Mr. Hicks's Badgers have not operated properly for their expected life expectancy. Had he known of the Defect, he would have either not purchased the Badger, not purchased the replacement, or would have paid less than he did. Therefore, he did not receive the benefit of his bargain.

158.     On May 17, 2023, Plaintiff Hicks put InSinkErator on notice of the Defect, his claims, and damages.  InSinkErator did not respond in writing, however, it has denied that there is any Defect.

### INSINKERATOR'S ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE DEFECT

159.     InSinkErator knew or should have known when it sold the Badgers to the public that the Badgers suffered from the Defect, and that the Defect caused the Badgers to malfunction during their expected useful life, fail prematurely, and might result in significant property damage to consumers and the public.

160.     InSinkErator founder John Hammes recognized the necessity of corrosion resistance in his original 1935 garbage disposal patent where he called for "a cylindrical casing formed from any desired material, preferably of a non-corrodible nature, such as aluminum." InSinkErator has known since its inception nearly 90 years ago that it was not preferable to use corrodible materials in its garbage disposals.

161.     InSinkErator's knowledge of these facts is established through its use of alternative design and materials selection in more expensive models with stainless steel, as well as through consumer complaints, including several years of public Internet posts on consumer websites, complaining that the Badgers failed during normal use. InSinkErator's knowledge of these posts is evidence as it has been responding to posts since at least 2011. Despite its knowledge,

InSinkErator did not remedy or eliminate the Defect in the Badgers or remove them from the stream of commerce, and/or improperly denied warranty claims.

162.    More than a decade of customer complaints are still available online regarding the Badgers. For example, consumers noted:

From Josh on Amazon in December of 2011, "**Another cracked case – Pick a different disposer!**" (Photograph Included in Paragraph 16)[32]:

> AVOID THIS PRODUCT! I'm yet another owner with a cracked case on my Badger 1 which led to leaks. The internal blades are also completely rusted. The disposer probably only lasted about two years before the crack occurred. The best feature of this disposer is that it's easily replaced with a better unit because of the common mounting system. I can't believe anyone continues to buy this after reading reviews. [Emphasis Added].

By PowerGuru in 2014[33]:

**Avoid it if you don't use it much or for rentals**

> When it's brand new, it works as expected and as well as ones that cost 2-3x as much. The little lugs are stainless, but every other metal parts inside is galvanized steel (steel with zinc coating). I doubt you'll have problems if you use it daily, but after about a year or two, the coating wear out and rusting gets increasingly worse and loses the ability to sit for more than a few days without seizing up. You'd have to break out the unjamming wrench to get it unstuck. I just don't really cook much and don't use mine often, so I've been having to turn it on every day to avoid it from happening. It's been like that for the past two years, but I didn't use it often enough to bother with replacing it. When it rusted so bad that it broke, I had to replace it... and I'm just getting around to reviewing it now. I think when people write reviews, they do it soon after purchase and haven't owned it long enough to see the lack of durability in the long run. This is definitely one of those products meant to deliver very good instant gratification. Got a used stainless steel model Evolution recently and haven't had this problem. That one's 4 years old and the chamber still looks brand new after cleaning. If I knew the Badger was going to turn out like this, I would've skipped it from the beginning. I've never felt that it didn't have enough

[32] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed March 20, 2023).

[33] https://www.homedepot.com/p/InSinkErator-Badger-5-Lift-Latch-Standard-Series-1-2-HP-Continuous-Feed-Garbage-Disposal-with-Power-Cord-BADGER-5-W-C/300278672#ratings-and-reviews (Last Accessed March 20, 2023).

power and the noise doesn't bother me at all given that its such a short duration, but you can't find stainless one in this size, so you're pretty much forced to go with 3/4 hp or 1 hp. Don't buy it for hp. Buy it for stainless construction.

From S. Eason in October of 2015, "**After finding a puddle coming from under the sink cabinet…**"[34]:

After finding a puddle coming from under the sink cabinet the other day, I looked inside and found the floor of the cabinet soft and rotting. My badger 1 has been slowly leaking from a crack for a while I didn't catch it. My Badger came with the house and is at least 7 years old, but it's only been used sparingly -no bones, peelings, lettuce, etc. I would definitely look at a different model or brand.

From Smokey, also in 2015[35]:

**Really bad case material. Weak and corrosion prone material.**

Was installed when house was built. Noticed corrosion in vertical crack lines around the exterior of the grind chamber. Some of the crack lines have started to leak. There are several thin vertical cracks every few inches. They start as small cracks then corrode and leave rust ridges eventually leaking through several of the cracks. Have applied silicone as temp fix but other cracks have now started leaking. The case appears to be aluminum casting but it must be steel based and very thin because if has cracked in several places and the rust builds up on a mound on the exterior of the crack then it starts to leak. I nearly purchased another of the same brand at the home depot store but checked online and saw many low reviews for this product. I found a waste king on the home depot website for $30.00 less ($54.99) regular price. The Waste King has a 2 year in home warranty and a LIFETIME corrosion warranty. I then checked to see if this one also had a corrosion warranty. No this product did not seem to have a corrosion warranty so I ordered the Waste King. See the attached photos for the cracks. I have removed the heavy rust from several of the crack so I could apply silicone to stop the leaks until I can get a replacement.

---

[34] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_unknown?ie=UTF8&filterByStar=two_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed on March 20, 2023).

[35] https://www.homedepot.com/p/InSinkErator-Badger-5-Lift-Latch-Standard-Series-1-2-HP-Continuous-Feed-Garbage-Disposal-with-Power-Cord-BADGER-5-W-C/300278672#ratings-and-reviews (Last Accessed on March 20, 2023).

From Kevin Koch in September of 2016, "**Switching brands because these things are junk**"[36]:

> What a piece of junk. Bought my house in 2009 and just discovered a crack in the casing. I'm suspecting a manufacturing defect to be completely honest. I understand that they only a 1 year warranty on the motor but that wasn't the part that failed. In my use cases it should have lasted forever. I've NEVER put any large objects or bones or anything through it. In fact, the only thing I've ever put down it are egg shells and vegetable scraps.
>
> It had issues of occasionally not chewing things up small enough and would cause a clog in the drain which I would have to remove the trap for. Bought a waste king with lifetime warranty and I'll never have to worry again!
>
> Photograph Included:



By Wappa in 2017 ("One Star")[37]:

Plastic housing cracked and leaked all the way around

---

[36] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed March 20, 2023).

[37] https://www.amazon.com/product-reviews/B000EW7LGA/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed March 23, 2023).

Photographs Included:



By 33899 in 2017[38]:

**Badger5 is leaking from numerous crack around its plastic casing. Totally surprised by this, assu...**

> Badger5 is leaking from numerous crack around its plastic casing. Totally surprised by this, assumed casing would be strong enough to withstand torque. It is not.

From Eric D. in July of 2019, "Housing failed in less than 3 years. Cheap, unreliable and potential liability"[39]:

> The Badger 1 insinkerator came installed with our new house purchase in July 2016. Today, I noticed a large amount of water in the cabinets under our kitchen sink. Upon investigation, I found two holes in the housing of this garbage disposal (see picture, just to the upper left of the pvc pipe. How they got there is a mystery. It can't be from high quality manufacturing though.
>
> We rarely use this thing, and it's never even jammed up. We don't abuse it with bones, silverware or glasses. And when I called insinkerator, they offered to send

---

[38] https://www.homedepot.com/p/InSinkErator-Badger-5-Lift-Latch-Standard-Series-1-2-HP-Continuous-Feed-Garbage-Disposal-with-Power-Cord-BADGER-5-W-C/300278672#ratings-and-reviews (Last Accessed March 20, 2023).

[39] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed March 20, 2023).

me a coupon to purchase another one, but I was in such a hurry because we needed to do our dishes that I ended up buying one from Home Depot.

I would avoid this cheap model and spring for a more expensive one that does not use galvanized steel. This is not even what I would describe as builder grade. It is a liability with the water damage we could have sustained if we didn't notice it in time. We bought a 900 model which uses stainless steel and I'm hoping it lasts longer.

From SteelyGrey in 2020[40]:

**Lasted for less than two years.**
**Would Not Recommend**

Bought at Lowe's to replace an older Badger unit which also only lasted a few years. Noticed water under the sink today which was leaking out onto the floor. The flange to the sink is OK, the drain plumbing is also OK. Water is leaking through the housing and out the bottom of the motor unit when water is even just being run in the sink. This unit is only run for 15-30 seconds a couple times a week. ISE used to be a great company and I've had older units that lasted 10-15 years. The entire Badger line is total "Builder Grade" junk. Will NEVER buy an ISE product again in my lifetime. Never buy any product if the company only offers a one year warranty. This means they don't trust their own products to even offer a 2-3 year warranty.

From ePetFan as recently as February 1, 2022, subject reading "Unacceptable Design Quality in Materials (Metal)"[41]:

I recently had to follow-up on a Badger Model 500-1A, 1/3 HP, 6.3 Amp under the sink food disposer that kept jamming and freezing up. The jam was easily overcome by disposal wrench and no obstructions were noticed in the spinning basin. There was friction to the rotation that I noted that seemed too high. I worked to clean any organic or other debris from the basin concentrated soap and high water with lots of rotation and spinning of rotor with the wrench. Once rinsing with lots of water, I even oiled the rotating parts with cooking again with lots of rotation. The friction seemed to be lessening, but in test operation with water flowing the disposal continued to spin for a moment and then jam, then trip the breaker. On further inspection on disassembly I saw the problem; the spin platten and chamber had extensively rusted and corroded. *Just for curiosity, I checked the manufacture date*

---

[40] https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-with-Cord-1-2-HP/1003259702 (Last Accessed March 20, 2023).
[41] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (Last Accessed March 20, 2023).

*with the manufacturer and the unit was less than 4 years old! With many years of experience with Sears Craftsman units (>30 years) of the same power and design, I have never seen this level of corrosion in such a short time.* The construction of this model is unacceptable for using interior body metals that do not have basic corrosion resistance to municipal water. I am going to check with the water company for typical pHs of their water but is very unusual not to have buffered water a little on the basic side. The acidity of the municipal water can not explain the excessive corrosion seen with this Badger unit. What we have here is a unit built so cheap that it should not be sold. I explained this to the manufacturer, but they seemed okay with this level of quality. My advice is to avoid this brand completely, This type of oversight in design speaks to a company that does not value manufacturing quality products. [Emphasis Added].

Photo Included:



From MacDiddy on March 7, 2022[42]:

**Poor Quality**
**Would Not Recommend**

This disposal was bought in 2018 and now only four years later has developed a large crack in the upper housing. Judging by the amount of rust it has been leaking for awhile before being finally discovered. Quality control issue I think judging by the other reviews of the same thing happening.

---

[42] https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-with-Cord-1-2-HP/1003259702 (Last Accessed March 23, 2023).



From CM on February 25, 2023, "**Smart design to make them rust intentially[sic], forcing you to buy a new one every few years**"[43]:

Original unit only lasted 6 years before leaking. Removed and opened it to find exact same failure as many YouTube videos showing exactly how they all fail. They are made of steel that rust. Considering how they are always wet, these units rust badly and develop holes on the motor cover causing a leak. Is it safe to have water drip on the 120V electric motor? I suspect they use rusty steel on purpose so you would have to replace them every few years. Have you heard of stainless steel? Even a plastic cover would be better than a thin raw steel cover.

Thanks to Amazon, a replacement unit arrived the same day. If you have time to do some research, look for a brand that uses stainless steel. Regular steel will rust out in few years - by design.

---

[43] https://www.amazon.com/product-reviews/B00PM8STLM/ref=cm_cr_unknown?ie=UTF8&filterByStar=two_star&reviewerType=all_reviews&pageNumber=1#reviews-filter-bar (Last Accessed March 20, 2023).

From D. Jerger on March 4, 2023[44]:

Keep a spare. *Will rust out at the end of warranty*. Was easy to replace though. Upper housing is cheap pop metal and easy to damage when trying to unstick. [Emphasis Added].

March 16, 2023 from booger, "**Only lasted 2 years**"[45]:

We spent the extra money and bought this because we were told it is a good brand. However, it did not even last two years. Both seams on the sides of the garbage disposal split so it leaked everywhere! We were very disappointed because we hardly used it. We are not people that cook a lot or put lots of things down the garbage disposal so needless to say we were upset that we had to purchase another one within two years of installing the first one! So you might not want to buy this brand.

163.    InSinkErator knows about these complaints, as it has also been responding to them for years and repeatedly blaming the consumer usage conditions, including contending rust is considered "normal wear and tear," and that "[r]ust will not degrade the performance of the disposer unless it is well outside of the disposer's lifespan."[46]

164.    As early as *2011*, a consumer reported to Consumer Product Safety Commission ("CPSC") regarding Model 1-83 (Badger), the following[47]:

**Incident Description**: The water leaks through the top of the garbage disposal and goes all the way down the motor department. The unit was orginally installed about 4 years and the failure has been occuring for a few months. They attempted to press the reset button on the bottom of the garbage disposal and it worked for a short period of time (amount of time unknown). While opening the bottom cabinet door they noticed that the unit had began leaking water through the motor again. *The firm was contacted on 6/3/2011 and a report with the representative (name unknown) and was advised that the unit was no longer covered under a warranty and there wasnt anything that they would be willing to do*. The garbage disposal was removed and placed in the garage. It has not been replaced with a replacement unit. [Emphasis Added].

**Incident Date**: 4/1/2011

---

[44] *Id.*
[45] *Id.*
[46] *See* responses to Faizi and SteveE below.
[47] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1186013 (Last Accessed March 21, 2023).

**Incident Location**: Home/Apartment/Condominium

InSinkErator responded to the CPSC report by stating:

> CPSC Report ID 20110607-8DBA3-1186013 The purpose of this response is to reply to the June 7, 2011 online submittal of the above-referenced consumer complaint. Subject garbage disposer was produced in May of 2006 and came with a 1-year in-home full service warranty. The InSinkErator Division of Emerson Electric Co. has not had an opportunity to examine the unit that is the subject of this report nor seen any documentation of the installation. Our Products Claims Administrator has spoken with the submitter who agreed to forward the disposer for further review at InSinkErator. There is no danger of electrical shock presented by the circumstances of this incident. Correct installation of this garbage disposer requires the use of a grounded electrical connection, which will protect against electrical shock in situations such as this. Furthermore, this product is constructed in compliance with UL Standard ANSI/UL 430 covering Waste Disposers.

165.    The reports of leakage related to the Badgers, and InSinkErator's inadequate responses continued for years, including as follows:

From Merkin2016[48]:

**JUNK**
**Would Not Recommend**

> We hardly use our garbage disposal at all. We put only small delicate material in it that is usually too fine to fish out of the sink. However, it developed 2 CRACKS in the upper housing. This caused a host of problems such as flooding under the sink, ruining some product stored there, water damage requiring tear out of toe kick, etc. for remediation. This was only 5 years old. It still looks new in appearance, but caused quite a mess due to poor manufacturing material. I believe the upper portion is pot metal or thin cast metal that just shook itself apart. SPEND THE EXTRA MONEY TO GET A BETTER UNIT. IT WILL BE CHEAPER IN THE LONG RUN. (Picture shows only one of the two cracks)

> Hi, this is Jerica from InSinkErator® Customer Service. I do apologize for the inconvenience that you encountered with your disposer. Our customer's experience and satisfaction with our products are very important to InSinkErator and I would like the opportunity to assist you with this. Kindly send an email to insinkeratorfeedback@emerson.com with your complete contact information and serial number of your disposer and I will get in touch with you. Thank you.

---

[48] https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-with-Cord-1-2-HP/1003259702 (Last Accessed March 20, 2023).



By Ant in July of 2020[49]:

**It worked great for 14 months, but noticed a leak and then a hole in the larger, upper section. I...**

It worked great for 14 months, but noticed a leak and then a hole in the larger, upper section. I'm guessing something punctured it but I only remember one time where a small metal item may have been inside and turned on for seconds upon hearing it. Also 3/4 HP is a little on the loud side.

by Ant

**Response from InSinkErator**

Jul 20, 2020

Hi Ant, I'm sorry to hear about what happened with your disposer. If there's a hole in the unit, it's possible that something may have compromised the body of the disposer but, through use, has just manifested. We're proud of our products and we always ensure you receive the best quality. If we find a flaw, we fix it and stand behind it, that's why they carry a warranty for all quality issues. Details about our warranty policy can be found in your product's manual or our website: https://bit.ly/2WCnwHm. Should you have other questions, please feel free to contact us at insinkeratorfeedback@emerson.com.

From Faizi in June of 2021[50]:

**Rusts and Leaks**

---

[49] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5XP-Lift-Latch-Power-Series-3-4-HP-Continuous-Feed-Garbage-Disposal-Badger-5XP/202832696/1 (Last Accessed June 14, 2023).
[50] https://www.homedepot.com/p/InSinkErator-Badger-5-Lift-Latch-Standard-Series-1-2-HP-Continuous-Feed-Garbage-Disposal-with-Power-Cord-BADGER-5-W-C/300278672#ratings-and-reviews (Last Accessed March 20, 2023).

Very disappointed in this product, have had previous insikerator model which lasted many years. When the motor burned out, I purchased it again thinking the build quality would be the same, it's not. Only after 4 years of very light use started leaking from the bottom due to rust, even though the unit functions fine. Called customer service they gave be a coupon for 40% off of a new unit, no thank you. Switched over to Everbilt 1/2 horsepower with a 4 yr warranty and lifetime corrosion warranty for half the price.

by Faizi

**Response from InSinkErator**

Jun 14, 2021

Hi Faizi, we appreciate you sharing your feedback with us. Just as is expected with other small home appliances, the life of an InSinkErator® Disposer is entirely dependent upon service conditions, usage patterns, and water quality. The amount of rust or discoloration varies and is dependent on usage and what may have been put through the disposer. Rust will not degrade the performance of the disposer unless it is well outside of the disposer's lifespan. We're sorry to see you go, but we completely understand how upset you must feel. We hope you'll consider InSinkErator again in the future.

From SteveE in March of 2022[51]:

**Beware of this garbage disposal**

After only 3 years, my disposal started leaking from the bottom. This was the 3rd Insinkerator disposal in 14 years so I decided to take this one apart before buying another. Insinkerator advertises the chopping area is galvanized, but once the galvanization wears off, the steel quickly rusts. This happen [sic] to mine so severely that it rusted a hole that allowed water to get into the motor compartment (see the blue circled area in the picture). No more "galvanized" and no more Insinkerator!

**Response from InSinkErator**

Mar 31, 2022

Hi SteveE, thanks for posting your review. We understand how unpleasant this experience must have been for you and we're sorry. Rust is something we generally consider normal wear and tear. The grinding components on our standard Badger Series are coated with corrosion resistant zinc and do not begin to discolor until this coating wears away. The amount of rust varies and is dependent on usage and what may have been put through the disposer. The water quality, use of aggressive cleaning solutions, or even grinding of acidic foods can speed up discoloration.

---

[51] *Id.*

We're always working hard to improve our products and we value your candid feedback.

166. In conjunction with InSinkErator's vast experience with garbage disposals, including designing, manufacturing, selecting materials for and selling the Badgers, these facts and complaints illustrate that InSinkErator knew or should have known of the Defect.

167. InSinkErator has a duty to disclose the Defect and to not conceal the Defect from Plaintiffs and Class Members. InSinkErator's failure to disclose, or active concealment of, the Defect places Plaintiffs and Class members at risk of property damage.

168. Upon information and belief, InSinkErator is currently still selling the defective Badgers, concealing the Defect, failing to notify consumers of the Defect, and failing to recall the Badgers.

169. Moreover, InSinkErator continues to falsely represent through written warranties and manuals that the Badgers are free from Defects in materials, are of merchantable quality, and will perform dependably for years.

170. When communicating with customers, InSinkErator does not disclose that the Badgers suffer from the Defect. As a result, reasonable consumers, including Plaintiffs and Class Members, purchased and used, and continue to purchase and use the Badgers in their homes even though they will prematurely fail, requiring costly repair.

171. Further, InSinkErator routinely denies claims as being out of warranty, when it knows that the Defect exists at the time of sale but typically does not manifest until after expiration of the Warranty.

172. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, would prematurely fail and cause damage to their property, and they would not have purchased the Badgers or would not have paid the same price.

39

173.    InSinkErator has wrongfully placed on Plaintiffs and Class Members the burden, expense, and difficulty involved in discovering the Defect, repairing and replacing the Badgers (potentially multiple times), and paying for the cost of damages caused by the Defect.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

174.    Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that their Badgers were defective within the time-period of any applicable statutes of limitation.

175.    Among other things, neither Plaintiffs nor the other Class Members knew or could have known that the Badgers contain the Defect, which causes leakage and damage to other property.

176.    Further, Plaintiffs and Class Members had no knowledge of the Defect and it occurred in a part of the Badgers that is not visible to consumers. InSinkErator attempted to conceal its knowledge of the Defect or otherwise capitalize on it further by selling defective replacement parts.  Accordingly, any applicable statute of limitation is tolled.

### B.    Fraudulent Concealment Tolling

177.    Throughout the time period relevant to this action, InSinkErator concealed from and failed to disclose to Plaintiffs and the other Class Members vital information about the Defect described herein.

178.    InSinkErator kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

179. Throughout the Class Period, InSinkErator has been aware that the Badgers it designed, manufactured, selected materials for and sold contained the Defect, resulting in premature and accelerated degradation of the Badgers and eventual leakage.

180. Despite its knowledge of the Defect, InSinkErator failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class Members, even though, at any point in time, it could have disclosed the Defect through recall, individual correspondence, media release, or by other means.

181. Plaintiffs and the other Class Members justifiably relied on InSinkErator to disclose the Defect in the Badgers that they purchased, because the Defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

182. Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the Defect, by virtue of the fraudulent concealment doctrine.

**C.      Estoppel**

183. InSinkErator was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the defective Badgers.

184. InSinkErator knowingly concealed the true nature, quality, and character of the defective Badgers from consumers.

185. Based on the foregoing, InSinkErator is estopped from relying on any statutes of limitations in defense of this action.

## UNCONSCIONABILITY AND FAILURE OF ESSENTIAL PURPOSE OF THE EXPRESS AND IMPLIED WARRANTIES

186. The express and implied warranties relating to the Badgers are unconscionable as follows:

a. In its exclusion of "incidental, special, indirect, or consequential damage" regardless of whether it is caused by product "nonperformance," despite knowing that premature failure of the Badger would almost certainly cause such damages;

b. In its exclusion for damages "caused by delay in performance," despite knowing that such delay could cause catastrophic property damage to the homeowner;

c. In its exclusion of damages that "exceed the price paid by the original owner for the InSinkErator product," knowing that the damages resulting from premature failure of the Badgers would almost certainly exceed the price of the Badger;

d. InSinkErator knew or should have known of the Defect in its Badgers prior to and at the time of sale of the Badgers to consumers, including from the complaints, many of which were directly reported to InSinkErator, as well as from the consumer complaints and Warranty claims made directly to InSinkErator;

e. InSinkErator was in a superior position to know of, remedy and disclose the Defect in its Badgers to Plaintiffs and Class Members, who could not have known of the Defect at the time of purchase;

f. Plaintiffs and Class Members had no bargaining power as they were unable to negotiate the terms of the Warranty, including the durational time limitation or disclaimers contained therein. This is "further evidenced by the fact the "complete InSinkErator warranty is included in the Care & Use Booklet *packaged with each unit*,"[52] which therefore demonstrates the Warranty is non-negotiable at prior to or at the time of purchase;

g. Plaintiffs and Class Members had no meaningful choice in the terms of the Warranty, including the durational time limitation or disclaimer contained therein;

h. Plaintiffs and Class Members had no meaningful choice in choosing another brand of oven, as any other reputable brand would likewise have warranties containing the same or similar terms and limitations;

i. There was a substantial disparity between the Parties' bargaining power such that Plaintiffs were unable to derive a substantial benefit from the Warranty. A disparity existed because InSinkErator was aware that the Badgers were inherently defective, Plaintiffs and Class Members had no notice or ability to detect the Defect, InSinkErator knew Plaintiffs and Class Members had no notice or ability to detect the Defect even if they could have inspected due to the latency of the Defect, and InSinkErator knew that Plaintiffs and Class Members would bear the cost of correcting the Defect. This disparity was increased by InSinkErator's knowledge

---

[52] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf. (Last Accessed August 23, 2023).

that failure to disclose the Defect would substantially limit the Oven's use and could cause it to fail altogether;

j. InSinkErator failed and refused to extend the time limitation of the Warranty to cover the Defect, which was known to InSinkErator and unknown to consumers at the point of sale;

k. Plaintiffs and Class Members had no ability to discover the Defect at the time of sale due to the latency of the Defect, and without being an expert on material selection in garbage disposals;

l. The durational limits on the Warranty are grossly inadequate to protect Plaintiffs and Class Members from the Defect;

m. InSinkErator sold the Badgers with knowledge of the Defect and of the fact that it may not manifest until after expiration of the Warranty;

n. InSinkErator sold the Badgers with knowledge of the Defect and of the fact that the Badgers would fail well before the expiration of their useful lives;

o. InSinkErator sold the Badgers with the knowledge that the nature of the Defect precludes any repair to the Defect or resulting damage, such that only replacement can temporarily prevent damage to other property;

p. InSinkErator sold the Badgers knowing that they were replacing Badgers with more defective Badgers that would fail or would likely fail;

q. InSinkErator sold the Badgers knowing that they were not capable of being repaired or replaced with non-defective Badgers within the Warranty period, or thereafter;

r. Plaintiffs and Class Members would have negotiated better terms in the purchase of their Badgers and Warranties had they been aware of the Defect, and been able to negotiate such terms; and

s. The terms of the Warranty unreasonably favor InSinkErator over Plaintiffs and Class Members.

187. Moreover, as corrosion occurs over time, the holes in the housing and Grind Chamber floor may not manifest until after the expiration of the Warranty, resulting in InSinkErator's denial of the warranty claim despite the existence of the Defect within the warranty period.

188.    Further, as zinc-coated galvanized steel is an inadequate materials selection, design, and manufacture, InSinkErator knows that through regular and foreseeable use the Badgers will degrade, develop holes, and leak. This knowledge is further demonstrated by use of stainless steel—an appropriate material for garbage disposals—in its higher end models.

189.    Extended product warranties are not available for purchase, and thus, the consumers have little choice but to accept the limited durational terms of the original Warranty.

190.    In addition, the Warranty fails of its essential purpose in that InSinkErator is unable to repair or patch the corrosion or repair the Defect given the construction of the Grind Assembly, and instead is only able to replace the corroded Badgers with equally defective Badgers.

191.    To the extent that InSinkErator offered to replace, or did replace, the defective Badgers, the warranty of replacement fails in its essential purpose given it is insufficient to make Plaintiffs and Class Members whole because the Warranty covering the Badgers provides that InSinkErator will replace the Badgers with identical, equally defective Badgers. Specifically, in its course of business, when InSinkErator opts to provide a replacement Badger to complaining consumers, the replacement Badger likewise contains the Defect, resulting in the same risks to the owners, and the same or similar damages can occur to the replacement Badgers and the owners' personal property. Accordingly, recovery by Plaintiffs and Class Members is not restricted to the promises in any written Warranties, and they seek all remedies that may be allowed.

192.    Any purported limitation on liability included as a part of the Warranty does not meet the requirements of such disclaimers under Illinois law because it is discretely and inconspicuously placed at the end of the Warranty without distinction as bold letters and capital letters are used throughout the Warranty.  Additionally, the Warranty seeks to limit Plaintiffs and Class Members' rights to seek incidental, special, indirect, consequential, and economic damages

for nonperformance or inability to use the product, or property damage caused by the product which, in essence, guarantees nothing about the performance of the Badgers.

### FED. R. CIV. P. 9(b) ALLEGATIONS
#### (Affirmative and By Omission)

193.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although the Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

194.    **WHO**: Defendant made material misrepresentations and/or omissions of fact in its website representations, warranties, owner's manuals, labeling and marketing, through employees receiving warranty claims, in responding to consumer complaints online, and through authorized retailers of the Badgers as to demonstrate that the Badgers were not defective in materials, used galvanized steel for "Disposer Durability,"[53] were of high-quality, would last at least 6–8 years[54] through normal use, and that any leakage occurred due to consumers' usage habits.

195.    **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Badgers were defective, were not durable, would damage Plaintiffs and Class Members, were not of high-quality, could only be replaced with more defective Badgers, and would fail prior to the 6–8 year service life[55] of a garbage disposal.  Defendant's employees

---

[53] https://insinkerator.emerson.com/documents/badger-1-garbage-disposal-specifications-en-us-6320196.pdf (Last Accessed March 21, 2023).

[54] https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals (Last Accessed XXX).

[55] https://www.amazon.com/productreviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&paInSinkEratorNumber=1#reviews-filter-bar (Last Accessed March 21, 2023).

and representatives made affirmative misrepresentations to Plaintiffs and Class Members at the time of purchase regarding the same qualities, when consumers contacted Defendant to make warranty claims, and in responding to online consumer complaints.  Further, Defendant's conduct has the effect of deceiving Plaintiffs and Class Members into believing that the Badgers are not defective, were "durable," had an effective Warranty, and that the Badgers would last as long as the average service life of a garbage disposal.  Defendant knew or should have known this information is material to the reasonable consumer, including Plaintiffs and Class Members, and impacts the purchasing decision, and yet it omits a necessary warning that the Badgers have the propensity to fail, leak, and cause damage to other property, including flooring, cabinetry, and other surrounding areas.

196.    **WHEN**: Defendant made the material misrepresentations and/or omissions detailed herein at the time Plaintiffs and Class Members performed research on the Badgers to gather information that would aid them in selecting the best Badger to purchase, at the time Plaintiffs and Class Members purchased the Badgers, at the time Plaintiffs and Class Members made warranty claims, in responding to consumer complaints online, and continuously throughout the applicable Class periods.

197.    **WHERE**: Defendant's material misrepresentations and/or omissions were made on its website, through marketing materials, in warranties, in user manuals, on the labeling of the packaging, through employees, and through authorized retailers.

198.    **HOW**: Defendant made written misrepresentations and/or failed to disclose material facts regarding the true risks of normal use of the Badgers.

199.    **WHY**: Defendant engaged in the material misrepresentations and/or omissions detailed herein (*e.g.*, knowing and concealing that knowledge of the Defect) for the express

purpose of inducing Plaintiffs and other reasonable consumers to purchase and/or pay for the Badgers. Defendant profited by selling the Badgers to many thousands of consumers.

200.   **INJURY**: Plaintiffs and Class Members purchased the Badgers when they otherwise would not have absent Defendant's misrepresentations and/or omissions, and, alternatively, paid more for the Badgers than they would have absent Defendant's misrepresentations and/or omissions. Further, the Badgers resulted in out-of-pocket costs to replace the Badgers, as well as damage to other property resulting from the leaks.

## CLASS ACTION ALLEGATIONS

201.   Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

202.   The Nationwide Class is defined as:

All persons in the United States and its territories who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after June 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Settlement Class Member.

203.   The Illinois Class is defined as:

All persons in the state of Illinois who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after June 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Settlement Class Member.

204.   The California Class is defined as:

All persons in the state of California who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after June 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Settlement Class Member.

205.    The Massachusetts Class is defined as:

All persons in the state of Massachusetts who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after June 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Settlement Class Member.

206.    The Missouri Class is defined as:

All persons in the state of Missouri who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after June 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Settlement Class Member.

207.    Excluded from the Classes are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, and their immediate families.

208.    Plaintiffs reserve the right to amend or modify the Class definitions after they have had an opportunity to conduct discovery.

209.    Numerosity: Fed. R. Civ. P. 23(a)(1).  The Classes are so numerous that the joinder of all members is unfeasible and not practicable.  While the precise number of Class Members has not been determined at this time, Plaintiffs are informed and believe that thousands of consumers have purchased the Class Badgers in Illinois, California, Massachusetts, Missouri, and nationwide.

210.  <u>Commonality</u>: Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation:

    a.  whether the Class Badgers are defective;

    b.  whether the Class Badgers suffer from inadequate materials selection, design, and/or manufacture;

    c.  whether the fact that the Class Badgers suffer from the Defect would be considered material to a reasonable consumer;

    d.  whether InSinkErator knew or should have know about the Defect before, during, and after distribution of the Badgers to the Plaintiffs, Class Members, and/or retailers;

    e.  whether InSinkErator's concealed from and/or failed to disclose to Plaintiffs and Class Members the defective nature of the Badgers;

    f.  whether InSinkErator breached warranties with respect to the Class Badgers;

    g.  whether InSinkErator's Warranty is unconscionable;

    h.  whether InSinkErator had a duty to disclose the defective nature of the Class Badgers to Plaintiffs and Class Members;

    i.  whether InSinkErator's conduct was unfair and/or deceptive;

    j.  whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction; and

    k.  in other ways to be supplemented as a result of discovery.

211.  <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

212.  <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of InSinkErator's unlawful and wrongful

conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for InSinkErator's misconduct. Absent a class action, Class Members will continue to incur damages, and InSinkErator's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

213.    Plaintiffs hereby adopt and incorporate by reference, all foregoing allegations as though fully set forth herein.

214.    In connection with its sale of the Badgers, InSinkErator expressly warranted that they were free from defects in materials at the time of purchase, and suitable for reliable garbage disposal.

215.    The defectively designed Badgers are subject to and otherwise covered by InSinkErator's Warranty, which applies to each Badger.

216.    At all times referenced herein, InSinkErator was the "seller" of the Badgers.

217.    At all times referenced herein, the Badgers were "goods."

218.    InSinkErator's representations in its Warranty and regarding the reliability and durability of the Badgers, among other representations, each constitute an affirmation or promise

50

made by the seller to the buyer which relates to the goods, and which becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise.

219. These descriptions and representations were made part of the basis of the bargain and created an express warranty that the goods shall conform to the description.

220. Each of the Badgers likewise has a substantially identical Warranty.

221. InSinkErator was obligated, under the terms of the express warranty to adequately repair or replace the defective Badgers for, or otherwise reimburse the costs of the Badgers to Plaintiffs and Class Members.

222. Privity is not required because Plaintiffs and each of the members of the Class are the intended beneficiaries of InSinkErator's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Badgers and have no rights under the warranty agreements provided by InSinkErator. InSinkErator's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the Badgers.

223. More specifically, InSinkErator's manifest intent that its warranties apply to Plaintiffs and consumer Class Members as third-party beneficiaries, is evident from the statements contained in its product literature, including its Warranty, which specifically states the Badgers are to be used for residential use. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiary of the products and warranties.

224. In its Warranty, InSinkErator warrants that the Badgers would be free of defects in materials for one year from the date of purchase.

225.    InSinkErator also expressly warrants that the Badgers are made with materials that ensure "Disposer Durability."[56]

226.    InSinkErator's warranty representations are made online, on its packaging, through its various manuals, and its Warranty.

227.    InSinkErator breached the warranty because it improperly and unlawfully denies valid warranty claims, and it has failed or refused to adequately repair or replace the Badgers with non-defective units or parts. Plaintiffs and the Class Members have privity of contract with InSinkErator through their purchase of the Badgers, and through the express written and implied warranties that InSinkErator issued to its customers. InSinkErator's warranties accompanied the Badgers and were intended to benefit end-users of the Badgers.

228.    To the extent Class Members purchased the Badgers from third-party retailers or via the purchase of their homes, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between InSinkErator and third-party retailers and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailer; in other words, the contracts are intended to benefit the ultimate consumer or user of the Badgers.

229.    The express written warranties covering the Badgers were a material part of the bargain between InSinkErator and consumers. At the time it made these express warranties, InSinkErator knew of the purpose for which Badgers were to be used.

230.    InSinkErator breached its express warranties by selling Badgers that were, in actuality, not free of defects in materials, were not made of materials "durable" for a garbage

---

[56] https://insinkerator.emerson.com/documents/badger-1-garbage-disposal-specifications-en-us-6320196.pdf (Last Accessed March 21, 2023).

disposal, would inevitably fail prematurely, were not made from merchantable material and workmanship, and could not be used for the ordinary purpose of reliably disposing of food waste.

231.    InSinkErator breached its express written warranties to Plaintiffs and Class Members in that the Badgers are defective at the time they leave the manufacturing plant, and on the first day of purchase, creating a risk of damage to Plaintiffs and Class Members.

232.    The Badgers that the Plaintiffs and Class Members purchased contained a Defect that caused each of them damages including water damage to cabinetry and flooring, loss of the product, loss of the benefit of their bargain, and other property damage.

233.    The limitations and the exclusions in InSinkErator's Warranty are harsh, oppressive, one-sided, unconscionable and unenforceable, as described supra, particularly because InSinkErator knew that the Badgers suffered from the Defect described herein.

234.    Any attempt by InSinkErator to limit or disclaim the express warranty in a manner that would exclude coverage of the Defect is unconscionable as a matter of law because the relevant purchase transactions were tainted by InSinkErator's concealment of material facts. Thus, any such effort to disclaim, or otherwise limit, its liability for the Defect is null and void.

235.    Moreover, InSinkErator was put on constructive notice about its breach through its review of consumer complaints dating back at least 10 years ago, as well as through appliance sale and repair entities, and, upon information and belief, through product testing.

236.    Despite having notice and knowledge of the defective nature of the Badgers, InSinkErator failed to provide any relief to Class Members with Badgers with expired warranties, failed to provide a non-defective replacement Badger to Plaintiffs and Class Members, and otherwise failed to offer any appropriate repair or compensation from the resulting damages.

237. InSinkErator breached its express warranty to adequately repair or replace the Badgers despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing the Badgers.

238. To the extent that InSinkErator offered to replace the defective Badgers, the warranty of replacement fails in its essential purpose given it is insufficient to make Plaintiffs and Class Members whole because the warranty covering the Badgers gives InSinkErator the option to repair or replace the Badgers, where neither is sufficient.

239. The Warranty also provides for reimbursement of the Badgers, but only if InSinkErator unilaterally determines repair or replacement to be insufficient. Upon information and belief, as part of its regular business practice, InSinkErator fails to provide for such reimbursement.

240. Accordingly, recovery by Plaintiffs and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

241. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, would cause damage, or that InSinkErator would not properly honor its warranty, they would not have purchased the Badgers or would have paid less for them.

242. To the extent any express warranties do not by their terms cover the Defect alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiffs and Class Members whole, the warranty fails of its essential purpose and, accordingly, recovery by Plaintiffs and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

243. Plaintiffs and Class Members have performed all duties required of them under the terms of the express warranty, except as may have been excused or prevented through the conduct

of InSinkErator or by operation of law in light of InSinkErator's conduct described throughout this Complaint.

244.    On May 17, 2023, InSinkErator has received timely notice regarding the problems at issue in this litigation, and notwithstanding, InSinkErator has refused to offer an effective remedy.

245.    As a direct and proximate result of InSinkErator's breach of its express written warranties, Plaintiffs and Class Members have suffered damages and did not receive the benefit of the bargain and are entitled to recover damages.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

246.    Plaintiffs hereby adopt and incorporates by reference, all foregoing allegations as though fully set forth herein.

247.    InSinkErator is and was at all relevant times a merchant with respect to the Class Badgers.

248.    The Class Badgers are and were at all relevant times a "good."

249.    InSinkErator was at all relevant times involved in the manufacturing, and is the distributor, warrantor, and/or seller of the Badgers.

250.    InSinkErator knew or had reason to know of the specific use for which the Badgers, as goods, were purchased.

251.    InSinkErator entered into agreements with retailers, suppliers, and/or Plaintiffs and Class Members to provide the Badger garbage disposals for installation in the homes of Plaintiffs and Class Members.

252.    InSinkErator provided Plaintiffs and Class Members with implied warranties that the Badgers were merchantable and fit for the ordinary purposes for which they were used and sold and were not otherwise injurious to consumers and their property.

253.    Although Plaintiffs did not purchase the Badgers directly from InSinkErator, they had sufficiently direct dealings by basing their eventual purchases on InSinkErator's specifications, representations regarding the quality and durability of the Badgers, and in InSinkErator's Warranty directly benefiting Plaintiffs and Class Members.

254.    Likewise, InSinkErator knew the identity, purpose, and requirements of the Badgers as operational garbage disposals that would not corrode through foreseeable water use in disposing of food waste, or otherwise prematurely fail.

255.    Additionally, Plaintiffs and Class Members were obvious third-party beneficiaries by the language of the Warranty, including that the warranty is provided to "the original *consumer owner* of the InSinkErator product," as well as "any subsequent *owner of the resident in which the Product was originally installed.*"[57]

256.    Similarly, other InSinkErator materials also indicate that Plaintiffs and Class Members were the intended third-party beneficiaries of the Badgers at issue, including through language in specification sheets that indicate the consumer is the actual user of the garbage disposals (*e.g.* "*We Come To You*" [In-Home Limited Warranty]; "]B]y using your disposal regularly, you can help divert food waste.").[58]

257.    However, the Badgers are not fit for their ordinary purpose of providing a reasonably reliable method of disposing of food waste because, inter alia, the Badgers contain a

---

[57] https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf [Emphasis Added].
[58] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf

Defect preventing the Badgers from reliably disposing of food waste through the garbage disposal because the Badgers corrode and cause leakage outside of the unit and damaging cabinetry and flooring. Therefore, the Badgers are not fit for their particular purpose of reliably disposing of food waste.

258.    Plaintiffs and Class Members have had sufficient direct dealings with either InSinkErator or one of its retailers to establish privity of contract between InSinkErator, on the one hand, and Plaintiffs and each Class Member, on the other hand.

259.    Notwithstanding, privity is not required because Plaintiffs and each of the Class Members are the intended beneficiaries of InSinkErator's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Badgers and have no rights under the warranties provided by InSinkErator. InSinkErator's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the Badgers.

260.    More specifically, InSinkErator's manifest intent that its warranties apply to Plaintiffs and consumer Class Members as third-party beneficiaries, is evident from the statements contained in its product literature, including its Warranty, which specifically states the Badgers are to be used for residential use. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the products and warranties.

261.    InSinkErator impliedly warranted that the Badgers were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Badgers manufactured, supplied, distributed, and/or sold by InSinkErator were safe and reliable for food waste disposal under the sink and through the plumbing system; and (ii) a warranty that the Badgers would be fit for their intended use while the Badgers were being operated.

262. Contrary to the applicable implied warranties, the Badgers, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable and durable methods of food waste disposal. Instead, the Badgers suffer from a defective design and/or manufacture, as alleged herein.

263. InSinkErator's failure to adequately repair or replace the defective Badgers has caused the warranty to fail of its essential purpose.

264. InSinkErator breached the implied warranties because the Badgers were sold with the Defect, which substantially reduced and/or prevented the Badgers from being used for safe food waste disposal.

265. Plaintiffs provided InSinkErator notice of its breach on May 17, 2023, prior to the filing of this Complaint.

266. Moreover, InSinkErator was put on constructive notice about its breach through its review of consumer complaints, as evidenced by its responses thereto, and other reports described herein, and, upon information and belief, through product testing and knowledge of appropriate material selection such as the stainless steel used for the Grind Assembly components.

267. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

268. As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**THIRD CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**BREACH OF CONTRACT/BREACH OF COMMON LAW WARRANTY**

**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

269.     Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

270.     To the extent InSinkErator's commitment is deemed not to be a warranty under the Uniform Commercial Code or common law, Plaintiffs plead in the alternative under common law warranty and contract law.

271.     Plaintiffs and Class Members purchased the Badgers from InSinkErator or through retailers such as Home Depot, Lowe's, Amazon, and other home good stores and authorized retailers.

272.     InSinkErator expressly warranted that the Badgers were fit for their intended purpose and that they were free of defects in materials, durable for garbage disposers, should last 6–8 years under normal, foreseeable use, and suitable for safely disposing of food waste under a sink and through plumbing.

273.     InSinkErator made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs, Class Members, and InSinkErator.

274.     InSinkErator breached the warranties and/or contract obligations by placing the defective Badgers into the stream of commerce and selling them to consumers, when it knew the Badgers contained the Defect, were prone to premature failure, and did not safely dispose of food waste. These deficiencies substantially and/or completely impair the use and value of the Badgers, and cause damage outside of the Badgers to cabinetry and flooring.

275.     The deficiencies described existed when the Badgers left InSinkErator's possession or control and were sold to Plaintiffs and Class Members. The deficiencies and impairment of the

use and value of the Badgers was not discoverable by Plaintiffs or Class Members at the time of the purchase of the Badgers.

276.     As a direct and proximate cause of InSinkErator's breach of contract, Plaintiffs and Class Members were harmed because they would not have purchased the Badgers if they knew the truth about the defective condition of the Badgers.

**FOURTH CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**UNJUST ENRICHMENT**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

277.     Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

278.     This alternative claim is asserted on behalf of Plaintiffs and Class Members to the extent there is any determination that any contracts between Class Members and InSinkErator do not govern the subject matter of the disputes with InSinkErator, or that Plaintiffs do not have standing to assert any contractual claims against InSinkErator.

279.     Plaintiffs and Class Members conferred a monetary benefit on InSinkErator, and InSinkErator had knowledge of this benefit. The average price paid by Plaintiffs and Class Members for the Badgers was more than $100.00.

280.     Given the reusable mount for replacement disposals, Plaintiffs and Class Members replaced defective Badgers with more defective Badgers, coming out of pocket the full price of the Badger again and prior to the expected service life.

281.     By its wrongful acts and omissions described herein, including selling the defective Badgers, InSinkErator was unjustly enriched at the expense of Plaintiffs and Class Members.

282.    Plaintiffs' and Class Members' detriment and InSinkErator's enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

283.    It would be inequitable for InSinkErator to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the defective Badgers.

284.    Plaintiffs and Class Members seek restitution from InSinkErator and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by InSinkErator from its wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

285.    Plaintiffs hereby adopt and incorporates by reference, all foregoing allegations as though fully set forth herein.

286.    InSinkErator has a duty to exercise reasonable care in the design, manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling the Badgers that InSinkErator places into the stream of commerce, including a duty to assure that the product will perform as intended and will not cause damage as described herein.

287.    InSinkErator breached its duty by failing to exercise ordinary care in the manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling the Badgers that InSinkErator placed into the stream of commerce in that InSinkErator knew or should have known that the product was defective, did not function as intended, and/or created a high risk of unreasonable, foreseeable consequences.

288.    The negligence of InSinkErator, its agents, servants, and/or employees, includes, but is not limited to, the following acts and/or omissions:

    a.  designing, manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling Badgers without thoroughly testing it;

    b.  negligently failing to adequately and correctly warn Plaintiffs, Class Members, and the public, of the risks, potential damage, and other harm such as property damage from premature failure of InSinkErator's Badgers;

    c.  negligently failing to recall or otherwise notify users at the earliest date that it became known that the Badgers was, in fact, defective and would prematurely fail;

    d.  negligently advertising and recommending the use of the Badgers without sufficient knowledge as to its manufacturing defect and premature failure;

    e.  negligently representing that InSinkErator's Badgers were suitable for its intended purpose when, in fact, the Defect will render the Badger unable to properly or safely dispose of food waste, and otherwise lead to water damage outside of the units themselves;

    f.  negligently selecting materials, designing, manufacturing and selling the Badgers in a manner that would prematurely fail; and

    g.  in other such ways that may be proven at trial.

289.    InSinkErator was negligent in the material selection, design, manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling of InSinkErator's Badgers in that it:

    a.  failed to use due care in materials selection, designing and manufacturing the Badgers so as to avoid the premature failure when the Badgers was used for their intended purpose;

    b.  failing to conduct adequate testing to determine the useful life of the Badgers;

    c.  failing to warn Plaintiffs, prior to actively encouraging the purchase of the Badgers either directly or indirectly, orally or in writing, about the defective nature of the product; and

    d.  in other such ways that may be proven at trial.

290.    Upon information and belief, despite the fact that InSinkErator knew or should have known that the Badgers were defective and would prematurely fail, InSinkErator continued to select zinc-coated galvanized steel, design, manufacture, process, distribute, deliver, supply, market and/or sell Badgers to Plaintiffs, Class Members, and/or the consuming public.

291.    InSinkErator knew or should have known that consumers such as Plaintiffs and Class Members would foreseeably suffer damage to the Badgers and Plaintiffs and Class Members' property as a result of InSinkErator's acts and omissions, as well as failure to exercise ordinary care, as well as InSinkErator's negligent materials selection, design and manufacture of the Badgers, as set forth herein.

292.    InSinkErator's negligence was the proximate cause of Plaintiffs' and Class Members' damages to property other than the products themselves, including water damage to cabinetry and flooring, as well as economic loss, which they suffered and will continue to suffer.

293.    By reason of the foregoing, Plaintiffs and Class Members experienced and/or are at risk of premature failure of the Badgers, and water damage to cabinetry and flooring.

294.    Plaintiffs, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

295.    As a direct and proximate result of InSinkErator's misconduct, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois, California, Massachusetts, and Missouri Classes)**

296.    Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

297. InSinkErator knew or should have known that the Badgers were defective in materials selection, design and manufacture, was not fit for its ordinary and intended use, and failed to perform in accordance with advertisements, marketing materials and warranties disseminated by InSinkErator, and with the reasonable expectations of ordinary consumers.

298. InSinkErator fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs and the Class that the Badgers are defective, are not "durable," would prematurely fail, and that the damages were not the result of consumer usage, mishandling or installation errors.

299. InSinkErator had exclusive knowledge of the defective nature of the Badgers at the time of sale and at all other relevant times. The Defect is latent and not something that Plaintiffs or Class Members, in the exercise of reasonable diligence, could have discovered independently prior to purchase.

300. InSinkErator had the capacity to, and did, deceive Plaintiffs and Class Members into believing that they were purchasing Badgers or homes with garbage disposals free from defects.

301. InSinkErator undertook active and ongoing steps to conceal the Defect. Plaintiffs are not aware of anything in InSinkErator's advertising, publicity, or marketing materials that disclosed the truth about the Defect, despite InSinkErator's awareness of the problem.

302. The facts concealed and/or not disclosed by InSinkErator to Plaintiffs and Class members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or to pay the same price for) the Badgers.

303. InSinkErator intentionally concealed and/or failed to disclose material factors for the purpose of inducing Plaintiffs and the Class to act thereon.

304. Plaintiffs and the Class justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Badgers.

305. Plaintiffs and Class Members suffered a loss of money in an amount to be proven at trial, inter alia, as a result of InSinkErator's fraudulent concealment and nondisclosure because they would not have purchased the Badgers on the same terms if the true facts concerning the defective Badgers had been known.

306. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

307. By reason of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer damage and injury.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT ("ICFA"),**
**815 ILCS 505/1, *ET SEQ*.**
**(Plaintiffs Miller Individually and on Behalf of the Illinois Class)**

308. Plaintiff Miller hereby adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

309. Plaintiff and Illinois Class Members are persons within the context of the ICFA, 815 ILCS CS 505/1(c).

310. At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

311. Plaintiff and Illinois Class Members are "consumers" who purchased the Badgers for personal, family, or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

312.    The ICFA prohibits engaging in any "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."  815 ILCS 505/2.

313.    The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA").  815 ILCS 505/2.

314.    Defendant's conduct, as described herein, took place within the state of Illinois and constituted unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, et seq.

315.    Defendant engaged in deceptive trade practices in violation of the ICFA by failing to disclose and actively concealing the risks posed by the Defect.

316.    Defendant violated the ICFA and Section 2 of the UDTPA by representing that the Badgers have characteristics or benefits that they do not have and that the Badgers "are of a particular standard, quality or grade" when they are of another.  815 ILCS 505/2; 815 ILCS 510/2(7).

317.    Defendant advertised the Badgers with intent not to sell them as advertised, in violation of 815 ILCS 505/2 and 815 ILCS 510/2(9).

318.    Defendant engaged in fraudulent and/or deceptive conduct which creates the likelihood of confusion or of misunderstanding in violation of 815 ILCS 505/2 and 815 ILCS 510/2(3).

319.    Defendant has known of the Defect for at least a decade.  However, Defendant continued to allow unsuspecting purchasers to buy the Badgers and allowed them to continue using the Badgers, knowing they would eventually leak.

320.    Defendant owed Plaintiff and Illinois Class Members a duty to disclose the true durability and reliability of the defective Badgers because Defendant: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff and Illinois Class Members; and/or (c) made incomplete representations about the durability and reliability of the foregoing generally, while withholding material facts from Plaintiff and Illinois Class Members that contradicted these representations.

321.    Defendant intended that Plaintiff and Illinois Class Members would, in the course of their decision to expend monies in purchasing or repairing the Badgers, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Badgers with respect to materials, workmanship, design and/or manufacture.

322.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the defective Badgers were material to Plaintiff and Illinois Class Members and any reasonable consumer would have considered those facts important in deciding whether to purchase a garbage disposal.  A garbage disposal made by a reputable manufacturer of durable and reliable garbage disposals is worth more than an otherwise comparable garbage disposal made by a disreputable manufacturer of defective garbage disposals that conceals defects rather than promptly remedies them.

323.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and

Illinois Class Members to be deceived about the reliability and durability of the Badgers, and that such Badges would be backed by both express and implied warranties that would in fact be honored by Defendant.

324. Although Defendant and its agents were aware that the Badgers were defective at the time Plaintiff and Illinois Class Members purchased their Badgers, Defendant failed to disclose as much to Plaintiffs and Illinois Class Members and/or otherwise provide a fix for the Defect, free of charge, as to comply with the terms of its written warranty and prevent the damages described herein.

325. Plaintiff and Illinois Class Members reasonably relied upon Defendant's misrepresentations and omissions and expected that the Badgers would not be defective and leak, such that it would render the Badgers unusable and not fit for their ordinary use. Further, Plaintiffs and Illinois Class Members reasonably expected Defendant would honor its warranty obligations as represented to them at the time they purchased their Badgers.

326. Defendant's conduct offends public policy as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Plaintiff and Illinois Class Members (who were unable to have reasonably avoided damages through no fault of their own) without any countervailing benefits to consumers.

327. Plaintiff and Illinois Class Members have been damaged as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Badgers.

328. As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and Illinois Class Members have suffered ascertainable loss of monies and property, caused by Defendant's misrepresentations and failure to disclose material information

and refusal to provide effective cost-free repairs pursuant to its warranty and the average useful life of a garbage disposal.

329. Had they been aware of the Defect in the Badgers, Plaintiff and Illinois Class Members either would have paid less for their Badgers or would not have purchased them at all or on the same terms. Plaintiff and Illinois Class members did not receive the benefit of their bargain as a result of Defendant's misconduct.

330. Plaintiff and Illinois Class Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorneys' fees, pursuant to section 815 ILCS 505/10a of the ICFA. Plaintiff and Illinois Class Members are also entitled to injunctive relief, seeking an order enjoining Defendant's unfair and/or deceptive acts or practices.

<u>EIGHTH CAUSE OF ACTION</u>
**VIOLATIONS OF THE CALIFORIA LEGAL REMEDIES ACT ("CLRA"),**
**CAL. CIVIL CODE §§ 1750, *ET SEQ*.**
**(Plaintiff Simmons Individually and on Behalf of the California Class)**

331. Plaintiff Simmons hereby adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

332. InSinkErator's conduct falls within the meaning of this statute because it caused transactions resulting in the sale or lease of goods or services to consumers – namely, the sale of defective Badgers. The Badgers are considered goods or services within the meaning of the statute under Cal. Civil Code § 1761(a) and/or the sale of the Badgers is considered a service under Cal. Civil Code § 1761(b).

333. Plaintiff and California Class Members are consumers pursuant to the statute.

334. InSinkErator violated the CLRA by way of the following provisions:

69

a. "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

b. "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

c. "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9);

d. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Civil Code § 1770(a)(14); and

e. "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

335.    InSinkErator engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Civil Code § 1770(a)(5), (a)(7), (a)(9), (a)(14), and (a)(16) when it manufactured, supplied, distributed, and/or sold Badgers which were advertised and/or warranted as safe and reliable for food waste disposal but otherwise concealed a known Defect.

336.    More specifically, InSinkErator misrepresented, *inter alia*, that the materials were "durable" for a garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[59]

337.    InSinkErator is aware and cognizant that its representations that the Badgers worked properly is false and misleading.

338.    Had Plaintiff and the California Class known of the Defect, they would not have paid—or would have paid substantially less—for the Badgers at issue.

---

[59] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf; *prev.* https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals; *see* https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf.

339. As a result of InSinkErator's unlawful conduct, Plaintiff and California Class Member were injured and suffered damages. Plaintiff and California Class members are entitled to recover their actual damages, and costs and disbursements, including costs of investigation and reasonable attorneys' fees, as well as injunctive relief and other equitable relief, including restitution, as determined by the Court, pursuant to the CLRA.

340. Plaintifs provided notice to InSinkerator of its violations of the CLRA, in addition to breaches of warranties and violations of other consumer protection statutes on May 18, 2023. InSinkErator did not respond in writing, however, it has denied that there is any Defect.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORIA UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.
### (Plaintiff Simmons Individually and on Behalf of the California Class)

341. Plaintiff Simmons hereby adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

342. InSinkErator violated the UCL, pursuant to Cal. Bus. & Prof. Code § 17200, by engaging in "unfair competition" which is defined as "any unlawful, unfair, or fraudulent business practices [including] unfair, deceptive, untrue or misleading advertising."

343. InSinkErator's actions, as alleged herein, constitute fraudulent, unfair, deceptive, and unlawful business practices committed in violation of the UCL because it violated the CLRA, as described above.

344. All of the conduct and representations alleged herein occurred in the course of InSinkErator's business and were part of a pattern or generalized course of illegal conduct.

345. InSinkErator's conduct was fraudulent because InSinkErator failed to disclose the Defect associated with the Badgers.

346.     InSinkErator's conduct was unfair because it was specifically designed to and did induce Plaintiff and California Class Members to purchase the Badgers at issue.

347.     InSinkErator's conduct was deceptive because it was specifically designed to and did induce Plaintiff and California Class Members to purchase the Badgers at issue despite knowing that they contained the Defect.

348.     Plaintiff and California Class Members reasonably and justifiably relied on InSinkErator's conduct alleged herein.  But for such conduct, Plaintiff and California Class Members would not have purchased the Badgers at issue.

349.     As a result of InSinkErator's conduct, Plaintiff and California Class Members have suffered injury-in-fact, lost money, and potential damage to property, in that they have incurred actual costs to repair and/or replace the Badgers upon manifestation of the Defect.

350.     Plaintiff and California Class Members seek to recover from InSinkErator restitution of earnings, profits, compensation, and benefits obtained as a result of the practices that are illegal under the aforementioned statute.

## TENTH CAUSE OF ACTION
**VIOLATIONS OF THE CALIFORIA FALSE ADVERTISEMENT LAW ("FAL"),
CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*
(Plaintiff Simmons Individually and on Behalf of the California Class)**

351.     Plaintiff Simmons hereby adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

352.     The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of the FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

353.     Pursuant to the FAL, "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or

72

to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

354. Defendant marketed, labeled, and represented the Badgers as merchantable and fit for the ordinary purposes for which they were used and sold and were not otherwise injurious to consumers and their property.

355. More specifically, InSinkErator misrepresented, *inter alia*, that the materials were "durable" for a garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[60]

356. To the contrary, the Badgers contained the Defect at the time of purchase and no reasonable consumer would believe that, in light of the Defect, that the Badgers were merchantable or fit for the ordinary purpose for which they were used and sold or were not otherwise injurious to consumers and their property through leakage under cabinetry, where Plaintiffs and Class Members could not immediately identify the Defect or damage.

357. At the time of their misrepresentations, Defendant was either aware of the Defect or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed, omitted, and failed to disclose this information to Plaintiffs and California Class Members.

358. Defendant's descriptions of the Badgers were false, misleading, and likely to deceive Plaintiff and other reasonable consumers.

---

[60] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf; *prev.* https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals; *see*
https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf.

359.    Defendant's conduct therefore constitutes deceptive or misleading advertising.

360.    Plaintiff has standing to pursue claims under the FAL as Plaintiff reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the Badgers when selecting and purchasing the Badgers.

361.    In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Badgers, Plaintiff and California Class Members purchased the Badgers.

362.    Had Defendant disclosed the true nature of the Badgers (that they contained the Defect), Plaintiff and California Class Members would not have purchased the Badgers or would have paid substantially less for them.

363.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has ill-gotten gains and/or profits, including but not limited to money from Plaintiff and California Class Members who paid for the Badgers, which contained the Defect.

364.    Plaintiff and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff and California Class Members as provided for by the FAL.

## ELEVENTH CAUSE OF ACTION
### VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION LAW
### MASS. GEN. LAWS C. 93A, §§2 ET SEQ.
### (Plaintiff Schubert Individually and on Behalf of the Massachusetts Class)

365.    Plaintiff Schubert hereby adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

366.    M.G.L. c. 93A, § 9 provides that "[a]ny person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or

employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder . . . may bring an action in the superior court . . . for damages and such equitable relief . . . ." Section 2 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . "

367.     During the relevant period, Defendant was engaged in trade or commerce within the Commonwealth of Massachusetts.

368.     As described herein, Defendant engaged in unfair and deceptive business acts and/or practices in violation of M.G.L. c. 93A, §§ 2 and 9 including by failing to disclose and actively concealing the risks posed by the Defect.

369.     Additionally, InSinkErator further violated M.G.L. c. 93A by representing that the Badgers have characteristics or benefits that they do not have, and advertising the Badgers with intent not to sell them as advertised.

370.     More specifically, InSinkErator misrepresented, *inter alia*, that the materials were "durable" for a garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[61]

371.     Additionally, Defendant engaged in unfair and deceptive business acts and/or practices in violation of M.G.L. c. 93A, §§ 2 and 9 by breaching the implied warranty of merchantability under to M.G.L. c. 106, § 2-314. See, e.g., 940 Code Mass. Regs. § 3.16(2); 940 Code Mass. Regs. § 3.08(2).

---

[61] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf; *prev.* https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals; *see* https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf.

372.     Defendant's violation of the Massachusetts Attorney General regulations enumerated above also violates M.G.L. c. 93A § 2(a) because regulations promulgated by the Massachusetts Attorney General under c. 93A § 2(c) provide that any act or practice violates Chapter 93A, § 2 if "It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection..." 940 Code Mass. Regs. § 3.16(3).

373.     Defendant's violations of c. 93A were committed willfully, knowingly and in bad faith.

374.     Plaintiff and Massachusetts Class Members have sustained actual damages as a result of Defendant's violations of M.G.L. c. 93A.

375.     Plaintiff made a demand for relief, in writing on behalf of herself and the Massachusetts Class to Defendant on May 17, 2023, prior to filing this amended complaint, to which Defendant responded acknowledging receipt and did not make a settlement offer.

376.     As of the date of this Complaint, Defendant has not made a reasonable offer of relief to Plaintiff and Massachusetts Class Members. In response to Plaintiff's demand letter, Defendant has not offered sufficient relief to Plaintiff or Massachusetts Class Members. Defendant's refusal to grant the relief requested by Plaintiff, on behalf of herself and Massachusetts Class Members, was made in bad faith with knowledge or reason to know that its acts violated M.G.L. c. 93A § 2(a).

377.     As a result of Defendant's violations of M.G.L. c. 93A §§ 2(a), 9, Defendant is liable to Plaintiff and Massachusetts Class Members for up to three times the damages that Plaintiff

and Massachusetts Class Members incurred, or at the very least refunds or the statutory minimum award of $25, together with all related court costs and attorneys' fees.

### TWELFTH CAUSE OF ACTION
**VIOLATION OF MISSOURI'S MERCHANDISE PRACTICES ACT ("MCPA"),**
**MO. REV. §§ 407.010, *ET SEQ***
**(On Behalf of Plaintiffs Hicks and the Missouri Subclass)**

378.    Plaintiff Hicks hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

379.    Defendant is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

380.    Defendant advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. §§ 407.010(4), (6) and (7).

381.    Plaintiff Hicks and Missouri Class Members purchased or leased goods or services primarily for personal, family, or household purposes.

382.    Defendant engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), including by failing to disclose and actively concealing the risks posed by the Defect, representing that the Badgers have characteristics or benefits that they do not have, and advertising the Badgers with intent not to sell them as advertised.

383.    Defendant has known of the Defect for at least a decade. However, Defendant continued to allow unsuspecting purchasers to buy the Badgers and allowed them to continue using the Badgers, knowing the Defect may manifest.

384.    Defendant owed Plaintiff and Missouri Class Members a duty to disclose the true durability and reliability of the defective Badgers because Defendant: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the

foregoing from Plaintiff and Missouri Class Members; and/or (c) made incomplete representations about the durability and reliability of the foregoing generally, while withholding material facts from Plaintiff and Missouri Class Members that contradicted these representations.

385.    Defendant intended that Plaintiff and Missouri Class Members would, in the course of their decision to expend monies in purchasing or repairing the Badgers, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Badgers with respect to materials, workmanship, design and/or manufacture.

386.    Defendant made affirmative misrepresentations that, *inter alia*, that the materials were "durable" for a garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[62]

387.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the defective Badgers were material to Plaintiff and Missouri Class Members and any reasonable consumer would have considered those facts important in deciding whether to purchase a garbage disposal.  A garbage disposal made by a reputable manufacturer of durable and reliable garbage disposals is worth more than an otherwise comparable garbage disposal made by a disreputable manufacturer of defective garbage disposals that conceals defects rather than promptly remedies them.

388.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and

---

[62] https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf; *prev.* https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals; *see*
https://insinkerator.emerson.com/documents/badInSinkEratorr-5-warranty-en-us-6868104.pdf.

Missouri Class Members to be deceived about the reliability and durability of the Badgers, and that such Badges would be backed by both express and implied warranties that would in fact be honored by Defendant.

389.    Although Defendant and its agents were aware that the Badgers were defective at the time Plaintiff and Missouri Class Members purchased their Badgers, Defendant failed to disclose as much to Plaintiff and Missouri Class Members and/or otherwise provide a fix for the Defect, free of charge, as to comply with the terms of its written warranty and prevent the damages described herein.

390.    Plaintiff and Missouri Class Members reasonably relied upon Defendant's misrepresentations and omissions and expected that the Badgers would not be defective, such that it would render the Badgers unusable and not fit for their ordinary use.  Further, Plaintiff and Missouri Class Members reasonably expected Defendant would honor its warranty obligations as represented to them at the time they purchased their Badgers.

391.    Defendant's conduct offends public policy as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Plaintiff and Missouri Class Members (who were unable to have reasonably avoided damages through no fault of their own) without any countervailing benefits to consumers.

392.    Plaintiff and Missouri Class Members have been damaged as a proximate result of Defendant's violations of the MCPA and have suffered damages as a direct and proximate result of purchasing the Badgers.

393.    As a direct and proximate result of Defendant's violations of the MCPA, as set forth above, Plaintiff and Missouri Class Members have suffered ascertainable loss of monies and property, caused by Defendant's misrepresentations and failure to disclose material information

and refusal to provide effective cost-free repairs pursuant to its warranty and the average useful life of a garbage disposal.

394.    Had they been aware of the Defect in the Badgers, Plaintiff and Missouri Class Members either would have paid less for their Badgers or would not have purchased them at all or on the same terms.  Plaintiff and Missouri Class Members did not receive the benefit of their bargain as a result of Defendant's misconduct.

395.    Plaintiff and Missouri Class Members are therefore entitled to relief, including all monetary and non-monetary relief allowed by law, including actual damages, restitution, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

C.    Grant restitution to Plaintiffs and the Classes and require InSinkErator to disgorge its ill-gotten gains;

D.    Permanently enjoin InSinkErator from engaging in the wrongful and unlawful conduct alleged herein;

E.    Award Plaintiffs and the Class Members their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

F.    Award Plaintiffs and the Class Members pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

G.    Award such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 23, 2023             Respectfully submitted,

/s/ Harper T. Segui
Harper T. Segui
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
825 Lowcountry Blvd., Suite 101
Mount Pleasant, SC 29464
Telephone: (919) 600-5000
Facsimile: (865) 522-0049
hsegui@milberg.com

Rachel Soffin
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
rsoffin@milberg.com

Thomas A. Pacheco
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (212) 946-9305
tpacheco@milberg.com

Jonathan Feavel
**FEAVEL & PORTER, LLP**
Vincennes, IN 47591
Telephone: (812) 886-9230
Facsimile: (812) 866-9161
feavel@feavelandporter.com

*Attorneys for Plaintiffs and Proposed Classes*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 23, 2023, the foregoing was filed using the Court's CM/ECF

service, which will send notification of such filing to all counsel of record.

<u>*/s/ Harper T. Segui*</u>
Harper T. Segui
